[Crim. No. 36155. Second Dist., Div. Three. Dec. 30, 1980.]

THE PEOPLE, Plaintiff and Respondent, v.
LAURA SCHINDLER, Defendant and Appellant.

COUNSEL

Paul J. Geragos and Jerome D. Savenick for Defendant and Appellant.

George Deukmejian, Attorney General, Robert H. Philibosian, Chief Assistant Attorney General, S. Clark Moore, Assistant Attorney General, Michael Nash, Robert F. Katz and Richard D. Marino, Deputy Attorneys General, for Plaintiff and Respondent.

## OPINION

**POTTER, Acting P.J.**—Defendant Laura Schindler appeals from the judgment of conviction of the second degree murder (Pen. Code, § 187) with use of a gun (Pen. Code, § 12022.5) of her husband, Louis Schindler.

On March 5, 1978, defendant (aged 51) fatally shot her husband who, 11 years before, had shot and killed his previous wife, June.[1] Though defendant did not remember firing the single shot, it was undisputed that she committed the homicide.

The defense introduced extensive evidence to show that defendant was suffering from diminished capacity and acted in self-defense. Numerous witnesses, including the decedent's daughter (defendant's stepdaughter) testified that defendant was a passive, gentle, dependent, severely depressed woman who was afraid of her domineering, explosive, irrationally hostile husband. During the last two years of their seven-year marriage, she had suffered severe weight loss and depression, becoming increasingly withdrawn, nervous and frightened of him. He sometimes slept with a knife under his pillow, enjoyed frightening her, and boasted in her presence about killing June and getting away with it because of his wealth. Defendant indicated to others that she was afraid to leave him because he had killed June when June was in the process of divorcing him. She testified that on the night of March 5, she was sitting on a chair next to the bed when Louis got into bed. He was in a surly mood. He then turned towards her with "a maniacal look on his face," and said in a very quiet, very low voice: "What happened to June

---

[1] The decedent, Louis, had fired the gun at June seven times; five bullets hit her, some in the back. He was twice convicted by juries (the first time for second degree murder; the second time for voluntary manslaughter), but the convictions were reversed on appeal. Then, pursuant to a plea bargain, he pled guilty to involuntary manslaughter and was released on probation without further incarceration.

is going to happen to you. I know what I have to do." Her next memory was being in jail.[2]

It was the opinion of Dr. Rose, a psychiatrist who testified for the defense, that at the time of the shooting, defendant was severely mentally incapacitated and was unable to form the intent to kill, premeditate, deliberate or harbor malice. She was in an extreme "state of panic," triggered by decedent's specific threat to kill her which she took very literally, was in mortal terror of her life, became totally irrational and lost control of her behavior.

In rebuttal, the prosecution called another psychiatrist, Dr. Markman. It was his opinion that defendant had an active physical fear of her husband and that the act of shooting him was inconsistent with her personality, but at the time she shot him, she was not legally insane, could form the intent to kill and could harbor malice.

On rebuttal, the People also attempted to counter the defense of diminished capacity by introducing evidence of a jail house in-custody interview conducted by Officer Osti a few hours after the homicide wherein defendant was advised of and exercised her *Miranda* rights. Over defense objection, the court ruled that such evidence was admissible to show "her state of mind." After relating his advisement of the *Miranda* rights, Osti then gave the following testimony with respect to defendant's responses and his opinion as an expert of her mental state:

"A. [by Officer Osti]: I asked her if she understood the rights I had explained to her and she said, 'Yes, but I don't want to make any statement until I have talked with an attorney.

". . . . . . . . . . . . .

"Q. [By Mr. Wells, the prosecutor]: Did you quit questioning her or asking her anything at that point?

---

[2]In her interview with the defense psychiatrist, defendant recalled that after her husband's statement she had become terrified, was in a panic, and he was lying down on the bed and pulling the covers over him angrily. She assumed she must have gotten up and got the gun. Her stepdaughter testified to being awakened by the defendant who was shaking, crying, very upset, and said, "I think I have done a terrible thing." The police, the ambulance and friends were called. Defendant told a friend over the phone, "I think I just shot Lou" and told the police when they came, "I shot him."

"A. Yes.

"Q. And in that conversation with her, did she appear to you that she did understand those rights?

"A. Yes.

"Q. Did she appear to you to understand you when you were talking to her?

"A. Yes.

"Q. Did she appear to be in a daze or a panic state or anything like that that you could describe?

"A. She was a little teary-eyed, but other than that, she seemed to understand what I was saying, appeared lucid to me.

" . . . . . . . . . . . . . .

"Q. Do you have any reason to believe in the responses she gave you that she didn't understand what you were saying to her?

"A. No, not at all. As far as I considered, she understood well what I was saying." The officer further testified that he overheard defendant ask her friend who had come to the police station to see if she could get Mr. Geragos for her defense attorney.

In argument to the jury, the prosecutor stressed the invocation of her *Miranda* rights, as follows: "What does she tell Osti? Osti gets up here on the witness stand. He advised her of her rights under *Miranda*. 'You have the right to remain silent. Anything you say can and will be used against you in a court of law. You have the right to the presence of an attorney. If you can't afford one, we will appoint one for you. Do you understand your rights?'

"'Yes, I understand my rights. I don't want to talk to you. I want a lawyer.'

"That is a panic state? It is a turn-off, turn-on panic state, yes. Selective amnesia, that is the word I like to use for it, because that is the only viable defense she has got. She has got a man she has shot in the

back of the head and the only defense that she could viably place in front of you is the fact that she did it when she didn't know what she was doing.

"She has enough presence of mind right after that when she is at the police station when Osti walks in there and questions her, she wants to see a lawyer."

The prosecutor further stressed her selection of that particular lawyer, Mr. Geragos: "Why do you think she asked for Mr. Geragos? Because Mr. Geragos had prosecuted Lou Schindler in one of those past cases. She knows what she wants.

"Panic state?

"Ten years from now, how many people are going to know who the prosecutor of this case was? Here is a woman that knew nothing about the death of June or anything else and she is in a panic state. She is asking for Paul Geragos."

Defense counsel Geragos immediately moved for a mistrial. The prosecutor claimed that it was already in the record through the People's rebuttal witness, Garfield,[3] that Geragos had been the prosecutor. Geragos pointed out that he had "denied it." The court denied the motion for mistrial, indicating that it agreed with the prosecutor that it was relevant impeachment, and suggesting that defense counsel could comment on it if he chose. In his argument, defense counsel did argue that he was not an issue in the case.[4]

Then, in his final summation to the jury, the prosecutor again stressed defendant's selection of Geragos to show defendant's guilt, stating: "The reason for bringing that statement in about Mr. Geragos is twofold: One, here is a woman that said she didn't know any of the circumstances about the death of Lou Schindler's previous wife, who just

---

[3]During Geragos' cross-examination of Garfield on an unrelated issue, Garfield volunteered the nonresponsive assertion, "You represented the People of the State of California in the three murders—in the homicide trials." Geragos had immediately responded, "I am sorry. I differ with you on that. Be that as it may, you are not asking the questions here. I am."

[4]The court had also agreed that it would instruct the jury that counsel was not an issue in the case. However, there is no record in the clerk's or reporter's transcripts of such an instruction.

got smatters and pieces from people as she went along and who evident-
ly somewhere along the line picked up the idea that Paul Geragos was
the prosecuting attorney against Mr. Lou Schindler. Here is a woman
who is in a panic state and within this panic state, she has a miraculous
ability, this selective amnesia, to turn it off, reach down to the depths of
her mind and pull out one attorney and of all of the attorneys in the
world she felt could best give her representation that night—we are
talking about the night of the killing—and that is Mr. Geragos. Where
do you think she pulled that name from? Out of a hat?

". . . . And this was a few hours after the commission of the act, the
act for which she was in a panic state."

After deliberating about 22 hours, the jury found defendant guilty of
second degree murder. This appeal followed.

### Contentions

Defendant contends that: (1) her constitutional rights against self-in-
crimination were violated by use of her responses asserting her *Miranda*
rights to rebut her defense of diminished capacity; (2) her right to
counsel was impaired by the use of her particular choice of counsel for
impeachment in argument, and (3) the evidence was insufficient to sup-
port the verdict of second degree murder. The People controvert these
contentions.[5]

### Discussion

#### Summary

Defendant's constitutional rights to due process and against self-in-
crimination were violated by the admission in evidence (and use in ar-
gument) of her responses asserting her *Miranda* rights for the purpose
of rebutting her diminished capacity defense. Further, exploitation of
her choice of counsel for impeachment and rebuttal of her defense im-
paired her constitutional right to counsel and constituted prosecutorial
misconduct. These errors were prejudicial. Accordingly, we must re-
verse the judgment. However, since the evidence was sufficient to
support the jury's verdict, defendant can be retried for second degree
murder.

---

[5]Since we must reverse because of violations of defendant's constitutional rights, we
need not reach her other contentions.

## Defendant's Rights to Due Process and Against Self-Incrimination Were Violated

█ The use of defendant's exercise of her *Miranda* rights to prove her guilt violated her rights to due process and against self-incrimination. The People claim that Officer Osti's testimony that she responded that she did not want to make a statement until she talked with an attorney, as well as his opinion that she understood her rights, was properly admitted to rebut her diminished capacity defense. We disagree.

In *Miranda* v. *Arizona* (1966) 384 U.S. 436, 468, footnote 37 [16 L.Ed.2d 694, 720, 86 S.Ct. 1602, 10 A.L.R.3d 974], the United States Supreme Court noted: "[I]t is impermissible to penalize an individual for exercising his Fifth Amendment privilege when he is under police custodial interrogation. The prosecution may not, therefore, use at trial the fact that he stood mute or *claimed his privilege* in the face of accusation." (Italics added.)

More recently, in *Doyle* v. *Ohio* (1976) 426 U.S. 610 [49 L.Ed.2d 91, 96 S.Ct. 2240], that court has held that the use, for impeachment purposes, of a defendant's silence at the time of arrest and after the receipt of *Miranda* warnings violates due process. The court stated (*id.*, at p. 618 [49 L.Ed.2d at p. 422]): "[W]hile it is true that the *Miranda* warnings contain no express assurance that silence will carry no penalty, such assurance is implicit to any person who receives the warnings. In such circumstances, it would be fundamentally unfair and a deprivation of due process to allow the arrested person's silence to be used to impeach an explanation subsequently offered at trial. [Fn. omitted.]" (See also *United States* v. *Hale* (1975) 422 U.S. 171 [45 L.Ed.2d 99, 95 S.Ct. 2133]; *People* v. *Galloway* (1979) 100 Cal.App.3d 551 [160 Cal.Rptr. 914].)

Such fundamental unfairness occurred here. The prosecution not only impermissibly introduced evidence concerning defendant's exercise of her right but also affirmatively used this evidence in argument to convey the impression that her defense of a "panic state" was fabricated. (Cf. *People* v. *Galloway, supra,* 100 Cal.App.3d at p. 558.)

Moreover, the fact that the evidence was introduced to rebut a diminished capacity defense did not render it proper. In *People* v. *Rucker*

(1980) 26 Cal.3d 368 [162 Cal.Rptr. 13, 605 P.2d 843], in an analogous situation, our Supreme Court held that the admission of evidence of interviews between a defendant and law enforcement officers (conducted without *Miranda* safeguards), which was offered to rebut a defense of diminished capacity, violated the privilege against self-incrimination (U.S. Const., 5th Amend.; Cal. Const., art. I, § 15) and the principles first enunciated in *Miranda* v. *Arizona, supra*, 384 U.S. 436. The court stressed that "the exclusionary rules relating to *Miranda* and to the privilege apply *regardless of the purpose for which the response is sought to be admitted or the timing of its admission.* (See *People* v. *Disbrow, supra*, 16 Cal.3d 101 [127 Cal.Rptr. 360, 545 P.2d 272] [impeachment evidence on rebuttal]; *People* v. *Walker, supra*, 29 Cal. App.3d 448 [105 Cal.Rptr. 672] [testimony of a psychiatrist, based on illegal interrogation, inadmissible on rebuttal to attack diminished capacity defense].)" (26 Cal.3d at p. 391.) (Italics added.) Indeed, in the course of its opinion, the *Rucker* court specifically observed that the use of a defendant's responses invoking his *Miranda* rights brought to the jury's attention "patently incriminatory and prejudicial material." (*Id.*, at p. 388.)

*Defendant's Constitutional
Right to Counsel Was Violated*

██ Defendant's constitutional right to counsel (U.S. Const., 6th Amend.; Cal. Const., art. I, § 15) was violated by the use of her choice of defense attorney to impeach her and rebut her defense of diminished capacity. As our California Supreme Court pointed out in *People* v. *Holland* (1978) 23 Cal.3d 77, 86 [151 Cal.Rptr. 625, 588 P.2d 765]: "The constitutional right to the effective assistance of counsel is 'among the most sacred and sensitive of our civil rights.' (*Magee* v. *Superior Court* (1973) 8 Cal.3d 949, 954 [106 Cal.Rptr. 647, 506 P.2d 1023].) That right is 'broader than...the bare right to legal representation...' and *encompasses the right to retain counsel of one's own choosing.* (*People* v. *Byoune* (1966) 65 Cal.2d 345, 348 [54 Cal.Rptr. 749, 420 P.2d 221]; accord *Chandler* v. *Fretag* (1954) 348 U.S. 3, 9 [99 L.Ed. 4, 9-10, 75 S.Ct. 1]; *Powell* v. *Alabama* (1932) 287 U.S. 45, 53 [77 L.Ed. 158, 162-163, 53 S.Ct. 55, 84 A.L.R. 527]; *People* v. *Douglas* (1964) 61 Cal.2d 430, 438 [38 Cal.Rptr. 884, 392 P.2d 964].)" (Italics added.)

In *Griffin* v. *California* (1965) 380 U.S. 609 [14 L.Ed.2d 106, 85 S.Ct. 1229], the United States Supreme Court held that prosecutorial

comment on a defendant's failure to testify violated the Fifth Amendment because it was tantamount to "a penalty imposed by the courts for exercising a constitutional privilege. It cuts down on the privilege by making its assertion costly." (*Id.*, at p. 614 [14 L.Ed.2d at pp. 109-110].)

The penalty analysis employed in *Griffin* is equally applicable to the constitutional right to counsel. We agree with the Third Circuit Court of Appeals in *United States* ex rel. *Macon* v. *Yeager* (3d Cir. 1973) 476 F.2d 613, 615, which stated: "For the purpose of the 'penalty' analysis,...we perceive little, if any, valid distinction between the privilege against self-incrimination and the right to counsel. It can be argued, with equal vigor and logical support, as to either...situation...that a prosecutor's comment seeking to raise in the jurors' minds an inference of guilt from the defendant's constitutionally protected conduct constitutes a 'penalty' on the free exercise of a constitutional right. [Fn. omitted.]"

In *Macon*, the prosecutor in his summation to the jury commented upon the fact that the defendant called an attorney the morning after the alleged crime and argued that this action cast doubt on the defendant's claim that the shooting was an accident. The *Macon* court held this to be reversible constitutional error, interpreting *Griffin* as an absolute prohibition against the imposition of any penalty for the exercise of a constitutional right in a criminal law context. (*Id.*, at pp. 615-616.)

Several states have also generally held that a prosecutor cannot properly imply guilt from a defendant's request for counsel. (See, e.g., *People* v. *Kennedy* (1975) 33 Ill.App.3d 857 [338 N.E.2d 414, 417-418]; *State* v. *Kyseth* (Iowa 1976) [240 N.W.2d 671, 674]; *Mays* v. *State* (Tenn. Crim. 1972) 495 S.W.2d 833, 836.)

In *United States* v. *Williams* (D.C.Cir. 1977) 556 F.2d 65, 67, the Circuit Court of Appeals for the District of Columbia pointed out that "[t]estimony about the desire or request for a lawyer is impermissible." The court noted that a prosecutor is constitutionally precluded from eliciting testimony of a defendant's action in hiring an attorney in view of the tendency of such testimony to serve as the base for an inference of guilt based on such an act. (*Id.*, at p. 66.)

Earlier, in *United States* v. *Liddy* (D.C.Cir. 1974) 509 F.2d 428, that same court indicated that the *Griffin* principle prohibits drawing ad-

verse inferences from not only the fact of hiring an attorney but also the time and circumstances of retaining an attorney. The court specifically warned of the "mischief of the approach" that allows time and circumstances to be taken into account because it "raises problems that hobble the right to seek counsel," inviting "probing of the very process of selection of counsel—who, why, when and where.…" (*Id.,* at p. 444.) As the *Liddy* court observed (*ibid.*): "It would be a rare case indeed where the prosecutor could not point out that the incriminating feature of the employment of counsel…rests not in the employment as such but in the time and circumstances surrounding that event, and inferences therefrom that reflect adversely on the defendant. [Fn. omitted.]"

Recently, in *United States* v. *Gold* (N.D.Ill. 1979) 470 F.Supp. 1336, the federal district court held that it was improper for prosecutors by questions and comments to draw adverse and incriminatory inferences from a corporation's employment during administrative proceedings and investigation of a particular law firm which had a nationwide reputation as criminal defense lawyers. The court stated (*id.,* at p. 1352): "It is not to be doubted that [the corporation] had the constitutional right to employ counsel of its choice in the administrative proceedings, and certainly to be advised with regard to the criminal investigation.…It is improper, where a right is constitutional, for a prosecutor either to question or comment on its exercise. [Citation.] To do so is to make assertion of the right costly. [Citations.] For this reason, in a criminal law context, it is basically unfair for a prosecutor to urge against a person the time and circumstances of his retention of an attorney."

Defendant had the constitutional right promptly to retain the counsel of her choice who would most effectively defend her. That right was wrongfully impaired. No prosecution testimony should have been admitted regarding her desire to hire any attorney, especially this particular defense attorney, or the defense attorney's prior role as a prosecutor of the decedent. Moreover, defendant clearly was impermissibly penalized for exercising her constitutional right to counsel by the prosecutor's flagrantly improper argument that the time and circumstances surrounding her selection of this particular defense counsel, who had prosecuted her husband, impeached her testimony and showed she was guilty of murder.

*The Errors Were Prejudicial.*

█ The improper exploitation of defendant's exercise of her constitutional rights to remain silent and to retain the counsel of her choice cannot be deemed harmless error under either the standard stated in *People v. Watson* (1956) 46 Cal.2d 818 [299 P.2d 243], or the higher standard specified in *Chapman v. California* (1967) 386 U.S. 18 [17 L.Ed.2d 705, 87 S.Ct. 824, 24 A.L.R.3d 1065]. The only issue at trial was defendant's intent and mental capacity at the time of the commission of the offense. The defense evidence was substantial. The rebuttal evidence directly attacked her defense, and the prosecutor's argument that the evidence showed she was fabricating her "panic" state was most prejudicial. Furthermore, the fact that the jury deliberated 22 hours before reaching a verdict underscores the closeness of the case and the crucial nature of the constitutional violations. (See *People v. Rucker, supra*, 26 Cal.3d at p. 391.) The judgment of conviction, therefore, must be reversed.

*The Evidence Is Sufficient*
*to Support the Verdict*

█ From our review of the entire record, we are satisfied that there was substantial evidence to support the jury's verdict of second degree murder. █ (See *People v. Johnson* (1980 26 Cal.3d 557, 578 [162 Cal.Rptr. 431, 606 P.2d 738].)[6] █ The necessary element of malice for second degree murder is implied from proof that the defendant assaulted the victim with a deadly weapon in a manner endangering life and resulting in death in the absence of justifying or mitigating circumstances. (*People v. Lines* (1975) 13 Cal.3d 500, 506 [119 Cal.Rptr. 225, 531 P.2d 793].) Here, the undisputed evidence showed that defendant shot the victim once in the head. The psychiatric testimony was conflicting; the prosecution's psychiatrist (Markman) gave his expert opinion that defendant could harbor malice and was not suffering from diminished capacity. Moreover, the ultimate conclusion as to whether defendant had diminished capacity was a jury decision. (*People v. Cruz* (1980) 26 Cal.3d 233, 249 [162 Cal.Rptr. 1, 605 P.2d

---

[6]Defendant raised this contention in the context of a request that we modify the verdict pursuant to Penal Code section 1181, subdivision 6, to reduce it to manslaughter. The test of an appellate court's power to modify or set aside the verdict is whether there is substantial evidence to support it. (*People v. Serrato* (1973) 9 Cal.3d 753, 761 [109 Cal.Rptr. 65, 512 P.2d 289].)

830].) Similarly, whether self-defense was established was a question of fact for the jury to determine. (*People* v. *Germany* (1974) 42 Cal. App.3d 414, 421 [116 Cal.Rptr. 841].) Accordingly, our reversal of the judgment does not preclude a retrial of defendant for second degree murder. (Cf. *Burks* v. *United States* (1978) 437 U.S. 1, 11 [57 L.Ed.2d 1, 9-10, 98 S.Ct. 2141]; *People* v. *Belton* (1979) 23 Cal.3d 516, 527 [153 Cal.Rptr. 195, 591 P.2d 485].)

### *Disposition*

The judgment is reversed and remanded for further proceedings consistent with the opinion herein.

Cobey, J., and Allport, J., concurred.

Respondent's petition for a hearing by the Supreme Court was denied March 5, 1981. Rattigan, J.,* participated therein. Mosk, J., and Richardson, J., were of the opinion that the petition should be granted.

---

*Assigned by the Chairperson of the Judicial Council.