[Crim. No. 21857. First Dist., Div. Two. Jan. 8, 1982.]

THE PEOPLE, Plaintiff and Respondent, v.
JEAN HYSON FABERT, Defendant and Appellant.

**COUNSEL**

Ephraim Margolin, under appointment by the Court of Appeal, and Andrea L. Biren for Defendant and Appellant.

George Deukmejian, Attorney General, Robert H. Philibosian, Chief Assistant Attorney General, William D. Stein, Assistant Attorney General, Gloria F. DeHart and Kristofer Jorstad, Deputy Attorneys General, for Plaintiff and Respondent.

## OPINION

**TAYLOR, P. J.**—Defendant, Jean Fabert, appeals[1] from a judgment entered on a jury verdict after her second trial[2] finding her guilty of voluntary manslaughter (Pen. Code, § 192, subd. 1) with the use of a firearm (Pen. Code, § 12022.5) of her fourth husband, Anthony Fabert. Her major contention on appeal is that her constitutional right against self-incrimination was violated by the admission of evidence that she requested an attorney after she had been advised of her rights (*Miranda v. Arizona* (1966) 384 U.S. 436 [16 L.Ed.2d 694, 86 S.Ct. 1602, 10 A.L.R.3d 974]). As we agree that the admission of the evidence was prejudicial, the judgment must be reversed.

On the morning of August 13, 1978, defendant fatally shot her husband. Although she had no recollection of the shooting, it was undisputed that she committed the homicide.

Defendant adduced the testimony of two psychiatrists, Dr. Harris and Dr. Oldden. Both opined that all of her life, defendant had suffered from a diagnosable mental illness, a "hysterical personality." Both experts agreed that hysterical personalities were prone to "dissociative reaction," which meant a loss of all consciousness of what they are doing. Both concluded that defendant was not conscious when she fired the shots that killed her husband because of a "dissociative state" brought about by the shock of defendant's learning of another woman in her husband's life. Her "dissociated state" lasted until she heard her husband groaning and moaning as the result of his wound. The People presented no expert testimony.

On the day before the homicide, August 12, defendant and her husband saw her psychiatrist, Dr. Harris. Defendant had seen Dr. Harris

---

[1]The notice of appeal also states that the appeal is taken from the sentence. As the sentence is not appealable separately, that purported appeal must be dismissed.

[2]The judgment entered after the first trial was reversed by this court on March 5, 1980, in an unpublished opinion (1 Crim. No. 19164, S.Ct. No. 97932).

on at least three other occasions. Defendant became panicky because of the many hours her husband spent away from home. At the August 12 session with Dr. Harris, defendant's husband denied that he was seeing another woman.

When defendant arrived home on the evening of August 12, her husband was not home. However, he left a note stating he would return in a few hours. When he had not returned by midnight, defendant unsuccessfully tried to locate him by telephoning the police and several of his work colleagues. He finally returned about 8:45 a.m. and they talked. He told defendant that he was seeing another woman, someone "he had met on the street." Defendant felt as if she had been hit on the head; everything went white. The next thing she remembered was coming up the stairs with the police.

When a San Francisco police officer responded to a call, defendant was standing at the front of the back staircase. Defendant was "dazed" and "incoherent."[3] She said: "I have done a terrible thing" and "[h]e is upstairs." The officer followed her upstairs with the ambulance crew. They found the victim and ascertained that three shots had been fired. Defendant showed them the kitchen cabinet containing the .25 caliber automatic pistol used to fire the fatal shot. Defendant was advised of her constitutional rights.

Before the officers arrived, defendant had made two telephone calls. One was to Jacques Fabert, the decedent's father and defendant's third husband. When she told him that she was in trouble, Jacques Fabert suggested the name of an attorney, which she wrote down. Defendant's second telephone call was to her friend, Dr. Fessel. She told Fessel that if he called the police, she would shoot herself. When Dr. Fessel asked her where her husband was shot, defendant replied "in the chair opposite the television." Dr. Fessel asked her to tell him about the location of the wound. Defendant went to look and told Dr. Fessel. Dr. Fessel called the police and an ambulance, and arrived at defendant's apartment about 10 minutes later. When he was unable to reach the attorney mentioned by Jacques Fabert, Fessel called his own attorney. Fessel's original recollection was that he (rather than defendant) had brought up the matter of an attorney; however, he was not 100 percent certain.

---

[3]At the preliminary hearing, the officer had described her as "hysterical." At trial, he testified that he had used the wrong word.

Defendant's major contention on appeal is that the court erred in denying her mistrial motion and admitting testimony about her assertion of her constitutional rights to rebut her defense of unconsciousness and diminished capacity.

On direct, Officer Stasko (who had advised defendant of her rights) testified that before Dr. Fessel arrived, defendant requested and received permission to use the telephone "to get further advice." After Dr. Fessel arrived, Stasko testified that defendant stated: "I have already been advised to watch what I say and I need some more advice or information." At this point, defense counsel indicated he wished to approach the bench. Subsequently in chambers, defendant moved for a mistrial, citing *United States* v. *Hale* (1975) 422 U.S. 171 [45 L.Ed.2d 99, 955 S.Ct. 2133]. He urged that the elicitation of the previous testimony was prejudicial error of constitutional dimensions as "... a comment on Mrs. Fabert's being aware of and wanting to exercise her rights against self-incrimination ...." The motion for mistrial was denied and the court indicated that it would consider, as requested by defense counsel, a jury instruction on the matter. Defense counsel argued that the error could not be cured by admonition.

Subsequently, during cross-examination of Dr. Harris, the prosecutor brought up the issue of defendant's state of mind while being advised of her constitutional rights. A defense objection was overruled and Dr. Harris permitted to testify as follows: "MR. ROWLAND: Q. You took that into consideration in the formation of your opinion? A. Had to. Q. Okay. And you knew, then, that the officers advised her that she had the right to remain silent, that anything she could say can and will be used against her in a court of law, that she had a right to an attorney to be present before any questioning took place?" The court then instructed the jury that the above testimony was presented "only with reference to formulating questions to the doctor relative to the doctor's testimony ... don't draw any inferences one way or the other from the mentioning of explanation of rights."

During the cross-examination of defendant, when the prosecution asked whether defendant had been advised of her constitutional right to self-incrimination, defendant's counsel renewed his objection to that line of questioning. During a discussion in chambers, the prosecutor reiterated his position that the testimony was relevant "to show that she had the presence of mind at that particular time to protect her rights in that fashion." Defense counsel renewed his motion for a mistrial. The mo-

tion was denied and the testimony admitted to rebut the defendant's claim of unconsciousness and diminished capacity.

When the prosecution again asked defendant whether Officer Stasko had advised her of her constitutional rights, a defense objection was overruled. Defendant was then cross-examined in detail on the reading of the *Miranda* rights, including her response to the effect that she did not want to talk to the officer.

On rebuttal, the prosecution underscored the importance to this case of defendant's response to the *Miranda* warnings by recalling Officer Stasko and asking him if he had occasion to advise defendant of any constitutional rights. The prosecutor did so, despite his earlier representation that he was carefully keeping this testimony from the jury. Although the defense renewed its objection, the repetitive questioning concerning defendant's desire for an attorney continued. The jury heard the *Miranda* card read sentence by sentence, and each of defendant's responses. Stasko also testified that during defendant's conversation with Jacques Fabert, he heard her mention the word "lawyer." Subsequently, the court instructed the jury that the evidence concerning defendant's assertion of her rights could be considered only for its bearing on defendant's state of mind at the time of the shooting.

*Miranda v. Arizona, supra,* 384 U.S. 436, held that a defendant could not be penalized for exercising Fifth Amendment rights while in custody. More recently, *Doyle v. Ohio* (1976) 426 U.S. 610 [49 L.Ed.2d 91, 96 S.Ct. 2240], held that use, for impeachment purposes, of a defendant's silence at the time of arrest and after receipt of *Miranda* warnings violates due process. An express assertion of rights must also be beyond exploitation by the prosecutor. Otherwise, "[i]t cuts down on the privilege [against self-incrimination] by making its assertion costly" (*Griffin v. California* (1965) 380 U.S. 609, 614 [14 L.Ed.2d 106, 110, 85 S.Ct. 1229]). *Doyle,* supra, is not limited to in-custody situations, but is broadly interpreted to apply to any testimony about a defendant's desire or request for counsel (*People v. Galloway* (1979) 100 Cal.App.3d 551 [160 Cal.Rptr. 914]; see *Dean v. Israel* (E.D.Wis. 1981) 516 F.Supp. 477, 486).

Finally, the testimony cannot be used to rebut the defense of unconsciousness and diminished capacity (*People v. Schindler* (1980) 114 Cal.App.3d 178 [170 Cal.Rptr. 461]; cf. *People v. Rucker* (1980) 26 Cal.3d 368 [162 Cal.Rptr. 13, 605 P.2d 843]). Our Supreme Court em-

phasized in *Rucker*, at page 388, that bringing a defendant's responses to *Miranda* rights to the jury's attention is patently incriminatory and prejudicial. The People attempt to distinguish *Schindler, supra*. We, however, find *Schindler* particularly apposite. In *Schindler*, as here, the defendant's fatal shooting of her husband was admitted and the only issue was one of intent. Ms. Schindler, like defendant, relied on a defense of unconsciousness and diminished capacity. In *Schindler*, the prosecution's argument stressed the defendant's request for an attorney. Here, defendant's assertion of her rights was emphasized on rebuttal.

■ Here, as in *Schindler*, the prosecution not only impermissibly adduced evidence of defendant's exercise of her right to counsel but attempted to use this evidence to convey the impression that her defense was fabricated. The instant case is even more egregious than *Schindler*, since here the prosecution adduced no expert testimony on defendant's mental state. The case turned entirely on the credibility of the defendant. Strong evidence supported the defendant's case and the erroneously admitted testimony went directly to the heart of her defense (*People v. Rucker, supra*, 26 Cal.3d 368; *People v. Walker* (1972) 29 Cal.App.3d 448, 455 [105 Cal.Rptr. 672]). The fact that the jury deliberated for six hours before reaching a verdict underscores the closeness of the case and the crucial nature of the constitutional violation (*People v. Woodard* (1979) 23 Cal.3d 329, 341 [152 Cal.Rptr. 536, 590 P.2d 391]).

The improper exploitation of defendant's exercise of her constitutional right to remain silent and to retain the counsel of her choice cannot be deemed harmless error under either the harmless error standard of *People v. Watson* (1956) 46 Cal.2d 818 [299 P.2d 243], or the higher standard specified by *Chapman v. California* (1967) 386 U.S. 18 [17 L.Ed.2d 705, 87 S.Ct. 824, 24 A.L.R.3d 1065]. Further, comments that penalize the defendant for the exercise of her right to counsel, and that also strike at the core of her defense, cannot be considered harmless error. "The right to counsel is so basic to all other rights that it must be accorded very careful treatment. Obvious and insidious attacks on the exercise of this constitutional right are antithetical to the concept of a fair trial and are reversible error" (*United States v. McDonald* (5th Cir. 1980) 620 F.2d 559, 564). The judgment of conviction, therefore, must be reversed.

Contrary to the People's contention, the error was not cured by the court's instructions. We note that a number of federal circuit courts

have expressed serious reservations about the efficacy of curative or limiting instructions to cure *Doyle* violations (see *United States* v. *Johnson* (5th Cir. 1977) 558 F.2d 1225, 1230; *Reid* v. *Riddle* (4th Cir. 1977) 550 F.2d 1003, 1004; *United States* v. *Impson* (5th Cir. 1976) 531 F.2d 274, 278, cert. den. (1978) 434 U.S. 1050 [54 L.Ed.2d 803, 98 S.Ct. 900]).

Here, the error was compounded as the court not only admitted the evidence but also explicitly instructed the jury to consider whether defendant's assertion of her rights discredited her defense of unconsciousness and diminished capacity. The court did not admonish the jury to ignore the questions and testimony about defendant's assertion of her rights.

In view of our conclusion, we need not discuss in detail defendant's remaining contentions on appeal. We address only those likely to occur on retrial.

Defendant next complains that the court erred in its instructions on voluntary and involuntary manslaughter. The instructions given are set forth below, so far as pertinent.[4]

---

[4]"In order to prove the commission of the crime of voluntary manslaughter, each of the following elements must be proved:

"That a human being was killed;

"That the killing was unlawful; and

"That the killing was done with the intent to kill.

"Involuntary manslaughter is the unlawful killing of a human being without malice aforethought and without an intent to kill.

"In order to prove the commission of the crime of involuntary manslaughter, each of the following elements must be proved:

"That a human being was killed; and

"That the killing was unlawful.

"A killing is unlawful within the meaning of this instruction if it occurred:

"During the commission of a misdemeanor which is inherently dangerous to human life, namely, the offense of unlawfully exhibiting a firearm in violation of Penal Code Section 417. And that Code Section provides, in essense, as follows, that is, Penal Code Section 417:

"Every person who, except in self-defense, in the presence of another person draws or exhibits any firearm whether loaded or unloaded or any other deadly weapon in a rude, angry or threatening manner is guilty of a misdemeanor in violation of Penal Code Section 417 of the Penal Code.

"And there is no intent to kill if by reason of diminished capacity caused by mental illness, mental defect, or intoxication, the defendant did not have the mental capacity to harbor an intent to kill."

"If you find from the evidence that at the time the alleged crime was committed, the Defendant had substantially reduced mental capacity, whether caused by mental illness

■ Defendant argues that since the instructions failed to explain that a defendant's wrongful intent was required and that the wrongful intent and act must concur in the sense that the act must be motivated by the intent (Pen. Code, § 20; *People* v. *Green* (1980) 27 Cal.3d 1, 53 [164 Cal.Rptr. 1, 609 P.2d 468]), the court erred in refusing to give CALJIC Nos. 3.31 (concurrence of act and specific intent) and 3.31.5 (concurrence of act and mental state), as requested. We agree. We note, however, that CALJIC No. 3.31 has been criticized (*People* v. *Hill* (1980) 103 Cal.App.3d 525, 539 [163 Cal.Rptr. 99], concurring opn. of Jefferson, J.). On retrial, CALJIC No. 3.31 should be given with the last sentence tailored so that the specific intent required is part of the instruction.

■ Defendant also complains that the court erred by restricting CALJIC No. 8.77 to voluntary manslaughter. She urges that her diminished capacity could also prevent her from realizing that brandishing a gun was inherently dangerous. On retrial, the jury should be so instructed as well as on the lesser included offense of Penal Code section 417 (CALJIC No. 17.10).

The purported appeal from the sentence is dismissed. The judgment is reversed.

Rouse, J., and Miller, J., concurred.

---

or mental defect or any other cause, you must consider what effect, if any, *this diminished capacity* had on the Defendant's ability to form *any of the mental states* which is an *essential element of voluntary manslaughter.*" (Italics added.)