Filed 5/16/23  P. v. Rickard CA4/3

## NOT TO BE PUBLISHED IN OFFICIAL REPORTS

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b). This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FOURTH APPELLATE DISTRICT

DIVISION THREE

| | |
|---|---|
| THE PEOPLE, | |
| Plaintiff and Respondent, | G061087 |
| v. | (Super. Ct. No. 18NF1741) |
| DAMIAN EDWARD RICKARD, | O P I N I O N |
| Defendant and Appellant. | |

Appeal from a judgment of the Superior Court of Orange County, Michael Cassidy, Judge.  Affirmed.

Wallin & Klarich and Stephen D. Klarich for Defendant and Appellant.

Rob Bonta, Attorney General, Lance E. Winters, Chief Assistant Attorney General, Charles C. Ragland, Assistant Attorney General, Eric A. Swenson, Junichi P. Semitsu and Felicity Senoski, Deputy Attorneys General, for Plaintiff and Respondent.

\*          \*          \*

Child Sexual Abuse Accommodation Syndrome (CSAAS) is a pattern of conduct that is often exhibited by a child who has been sexually abused. (*People v. McAlpin* (1991) 53 Cal.3d 1289, 1300.) The five typical behaviors are: 1) secrecy; 2) helplessness; 3) entrapment and accommodation; 4) delayed, unconvincing disclosure; and 5) recantation. (*People v. Bowker* (1988) 203 Cal.App.3d 385, 389 (*Bowker*).)

Here, a young girl was eight years old when the man she called her grandfather, Damian Edward Rickard, began molesting her. The abuse continued for several years. The victim did not disclose the abuse until she was 14 years old.

During a jury trial, the court permitted a psychologist to testify about CSAAS and its five components. The prosecutor also asked, "is most sexual abuse by a family member or a stranger?" The expert witness testified, in part: "The research shows that 90 percent of sexual abuse occurs by someone known well to the child." The jury later found Rickard guilty of committing four counts of child sexual abuse.

We find the evidence about the identity of most child sexual abusers was outside of the scope of the testimony that had been ruled admissible by the trial court in this case, which was specifically limited to CSAAS. But we do not find the error to be prejudicial. We further find no other prejudicial errors. Thus, we affirm the judgment.

I

FACTS AND PROCEDURAL BACKGROUND

Taylor C. was about eight years old when her parents divorced and her father moved in with Rickard, her grandmother's boyfriend. Taylor and her two younger sisters would often visit Taylor's father and stay over at Rickard's house. Taylor called Rickard "grandpa." Shortly after Taylor's eighth birthday, she and one of her sisters were in Rickard's bedroom late one evening watching cartoons. Taylor's sister had fallen asleep. Rickard exposed his penis to Taylor, who was scared and hid under the covers.

2

Taylor did not tell anyone because Rickard "made me swear to secrecy."

On "countless" occasions thereafter, Rickard put his hands in Taylor's underwear. Rickard would lick his fingers and then put them into her vagina. Rickard also touched Taylor's breasts. Rickard once rubbed his penis on Taylor's vagina and her bottom area, but Rickard did not penetrate her. On another occasion, as Rickard was touching Taylor, he showed her a video on his phone in which he was being orally copulated. Rickard encouraged Taylor to orally copulate him, but she refused.

The last time Rickard tried to touch Taylor was when she was between seventh and eighth grade, but Taylor "told him I would tell my parents." Rickard acted angry and confused. Taylor said she had learned in a sex education class that what Rickard was doing "wasn't normal."

In eighth grade, Taylor told a friend in general terms what Rickard had done to her, but the friend kept Taylor's secret. When Taylor was 14 years old, her mother was cleaning her bedroom and found a note written by Taylor. When Taylor's mother asked her about the note, Taylor cried and disclosed what Rickard had been doing to her since she was eight years old.

The family contacted the police. The police surreptitiously recorded a phone call made by Taylor to Rickard while he was at work. During the "covert" phone call, Taylor asked, "We both know you put your fingers in my vagina and touched my breast when I was like eight years old, I just wanted to know why you chose me?" Rickard answered, "Uh, I really don't have a good answer to that . . . ." Taylor said, "I want you to apologize and promise you won't touch me, my vagina anymore." Rickard said, "Okay, you got that, I apologize and I won't never ever do it again."

About an hour after the covert phone call, the police arrested Rickard and seized his cell phone. During a search of the phone, the police observed a video in which Rickard was receiving oral sex from a woman.

3

*Court Proceedings*

The prosecution filed an information charging Rickard with digitally penetrating a child 10 years of age or younger, and three counts of committing a lewd and lascivious act upon a child under the age of 14. Rickard pleaded not guilty.

At a jury trial, the prosecution presented the testimony of seven witnesses during its case-in-chief. Dr. Jody Ward testified as an expert witness (the testimony will be covered in detail in the discussion section of this opinion).

Rickard called Taylor's grandmother and her two sisters as witnesses. The grandmother testified she was in shock about the charges, and never saw anything suspicious. The sisters generally testified they did not see any signs Taylor was experiencing sexual abuse. Rickard testified he did not molest Taylor. Rickard said he was at work during the covert phone call, he had consumed alcohol at a celebratory lunch, and during the call "a lot of things were racing through my head." Rickard testified Taylor often played with his phone and it was not password protected.

In the prosecution's rebuttal case, a police officer testified he arrested Rickard about an hour after the covert phone call. The officer said he did not see any signs that Rickard was under the influence. On cross-examination the following exchange occurred:

"[DEFENSE COUNSEL:] Had [Rickard] made phone calls before you got there or after you got there?

"[WITNESS]: After. After I spoke with him is when I asked him if he wanted to make phone calls.

"[DEFENSE COUNSEL]: All right. So he -- he tries to make the phone calls and you are present; is that correct?

"[WITNESS]: No. I don't recall if I was present. [¶] So he -- what happened, investigators detained him. I arrived on scene. I attempted to speak with him.

4

At that time he stated he wanted his lawyer and then he was asked --

"[DEFENSE COUNSEL]:  May we approach?"

Rickard moved for a mistrial based on an alleged violation of the United States Constitution, which the trial court denied.  (See *Doyle v. Ohio* (1976) 426 U.S. 610, 620 (*Doyle*).)  The court offered to tell the jury "to disregard the last answer," but Rickard's counsel declined.

The jury found Rickard guilty of the charged sexual offenses.  Rickard filed a motion for a new trial based, in part, on the alleged *Doyle* error.  The trial court denied the motion.  The court imposed an indeterminate prison term of 15 years to life, plus a determinate term of eight years.

## II

## DISCUSSION

Rickard contends:  A) the trial court improperly admitted CSAAS evidence; B) prosecutorial misconduct during closing argument; C) the court erred in denying his motion for a mistrial and/or new trial; and D) cumulative prejudice.

*A.  CSAAS Testimony*

Rickard contends the trial court improperly admitted Dr. Ward's expert testimony.  We disagree.  We find the court properly admitted the CSAAS testimony, except for one portion that was outside of the limited scope of the proffered evidence; however, we do not find the evidentiary error to be prejudicial.

We review a trial court's admission of evidence for an abuse of discretion. (*People v. Brooks* (2017) 3 Cal.5th 1, 43.)  However, there are varying degrees of deference within the abuse of discretion standard of review.  (*Haraguchi v. Superior Court* (2008) 43 Cal.4th 706, 711-712.)  A "trial court's findings of fact are reviewed for substantial evidence, its conclusions of law are reviewed de novo, and its application of

5

the law to the facts is reversible only if arbitrary and capricious." (*Ibid.*, fns. omitted.)

In this part of the discussion, we will: 1) state relevant principles of law; 2) summarize the proceedings in the trial court; and 3) apply the law to the facts.

### 1. Relevant Principles of Law

Generally, "all relevant evidence is admissible." (Evid. Code, § 351.) "'Relevant evidence' means evidence, including evidence relevant to the credibility of a witness . . . , having any tendency in reason to prove or disprove any disputed fact that is of consequence to the determination of the action." (Evid. Code, § 210.)

"If a witness is testifying as an expert, his testimony in the form of an opinion is limited to such an opinion as is: [¶] (a) Related to a subject that is sufficiently beyond common experience that the opinion of an expert would assist the trier of fact; and [¶] (b) Based on matter (including his special knowledge, skill, experience, training, and education) perceived by or personally known to the witness or made known to him at or before the hearing, whether or not admissible, that is of a type that reasonably may be relied upon by an expert in forming an opinion . . . ." (Evid. Code, § 801.)

"The theory of child sexual abuse accommodation syndrome was first delineated by Roland Summit." (*Bowker*, *supra*, 203 Cal.App.3d at p. 389, fn. 3.) CSAAS testimony describes five characteristic behaviors experienced by children who have been sexually abused: (1) secrecy; (2) helplessness; (3) entrapment and accommodation; (4) delayed, unconvincing disclosure; and (5) retraction. (*Id*. at p. 389.)

Although CSAAS testimony is <u>not</u> admissible to prove that the alleged molestation occurred, CSAAS testimony has been routinely held admissible "'to disabuse jurors of commonly held misconceptions about child sexual abuse, and to explain the emotional antecedents of abused children's seemingly self-impeaching behavior.'" (*People v. McAlpin*, *supra*, 53 Cal.3d at pp. 1300-1301 ["'great majority of courts

6

approve such expert rebuttal testimony'"]; *People v. Patino* (1994) 26 Cal.App.4th 1737, 1744 [CSAAS testimony is admissible for "disabusing a jury of misconceptions it might hold about how a child reacts to a molestation"]; *People v. Lapenias* (2021) 67 Cal.App.5th 162, 171 [it is well established in California law that CSAAS is relevant for evaluating the credibility of an alleged victim of child sexual abuse].)

Where CSAAS testimony is admitted during a criminal trial, the evidence must be tailored to target a particular myth or misconception. (*Bowker*, *supra*, 203 Cal.App.3d at pp. 393-394 ["it is the People's burden to identify the myth or misconception the evidence is designed to rebut"].) The admissibility of CSAAS "testimony must be handled carefully by the trial court." (*People v. Patino*, *supra*, 26 Cal.App.4th at p. 1744.)

### 2. *The Trial Court Proceedings*

The prosecution filed a pretrial motion arguing: "Evidence of 'Child Sexual Abuse Accommodation Syndrome' is admissible to dispel common myths *concerning victim behavior*." (Capitalization and boldfacing omitted, italics added.)

The prosecution's motion included a statement of anticipated facts. The prosecution proffered that CSAAS consists of five stages, citing a published opinion: "Stage one is secrecy, an element inherent in the adult-child relationship, where a child understands certain things should not be disclosed. Stage two is helplessness, the absence of power a child has in a relationship with a parental figure or trusted adult. . . . Entrapment and accommodation, the third stage, occurs after the child fails to seek protection. Stage four, delayed disclosure, occurs when the child tells someone about the sexual abuse. In retraction, the final stage, the child denies abuse has occurred." (*Bowker*, *supra*, 203 Cal.App.3d at p. 389.)

The prosecution argued in the pretrial motion that Rickard "was just like a grandfather to the victim. The victim never told her mother, father, sisters, or brothers what was going on between her and the Defendant. The defense is calling family members to testify that they never saw anything sexual going on, and in fact they observed that the victim acted normally around the Defendant. CSAAS testimony is imperative here so that the jury is not biased by the delay in reporting these incidents, and to give them an understanding of why sometimes victims in these situations are extremely reluctant to come forward. CSAAS also helps explain the dynamic between abuser and abused, and why other family members may recall the victim acting 'normally' around the Defendant. The People anticipate using Dr. Jody Ward to introduce this testimony."

At a pretrial hearing, Rickard's counsel orally cited an out-of-state opinion disapproving of the admission of CSAAS testimony. (See *State v. J.L.G.* (2018) 234 N.J. 265, 301-304.) Counsel also noted a more recent California published opinion that approved of the admission of CSASS testimony and said, "I'm kind of stuck with that case." (See *People v. Munch* (2020) 52 Cal.App.5th 464, 468.) Counsel stated: "There is always an issue as to what the person can testify to in their testimony. *It doesn't just open up the person to anything*." (Italics added.) The trial court ruled: "All right. As you indicated, under the California cases this testimony *is admissible for the purposes as [the prosecutor] outlined*, so I'll allow that." (Italics added.)

During its case-in-chief, the prosecution called psychologist Dr. Ward, who said that her specialty was in child sexual abuse, and she had testified in about 350 previous trials. Ward said she had no knowledge regarding the facts of the instant case. Ward testified CSAAS "is a pattern of behaviors that many children exhibit who have been sexually abused. Not all children exhibit all of these behaviors, but many do." Ward said CSAAS helps people "understand why children do what they do in response to

8

sexual abuse that occurs within an ongoing relationship." Ward testified CSAAS "is not a diagnostic tool, meaning we can't use it to diagnose or determine whether or not sexual abuse occurred."

Dr. Ward said CSAAS "applies only to child sexual abuse that's occurring within an ongoing relationship. These children respond very differently than do children who have been molested by a stranger. [¶] For example, children who have been molested by a stranger, they tend to report the abuse right away. . . . [¶] But when children are abused within an ongoing relationship, they don't tend to report the abuse right away out of loyalty and love for the abuser."

Dr. Ward said there are five stages of CSAAS: "secrecy, helplessness, entrapment, and accommodation, delayed unconvincing disclosure, and retraction or recantation." Ward testified: "Secrecy refers to the fact that all sexual abuse occurs in secret, with only the perpetrator and the victim there at the time the sexual abuse is occurring." She stated this "also refers to the fact that children keep the secret of sexual abuse for very long periods of time." Ward testified: "Helplessness refers to the power differential or imbalance between children and adults." She said entrapment and accommodation refer to children enduring sexual abuse, "believing they have to put up with" the abuse. And as far as disclosure, Ward testified "the research shows two-thirds of people wait until adulthood to report sexual abuse." Ward said that once children disclose sexual abuse, their lives are turned upside down, so they often recant. Ward testified that not all components of CSAAS are necessarily present in each case.

The prosecutor then asked, "Dr. Ward, is most sexual abuse by a family member or a stranger?" Ward responded: "The research shows that 90 percent of sexual abuse occurs by someone known well to the child. Only ten percent occurs from a stranger. And out of that 90 percent, they say half occurs within the family. So 45 percent -- and half occurs outside of the family, but still someone very well known to the

9

child.  And this is just because those people have more access to the child.  So it's just a matter of these people are around children more, where strangers have to take an opportunity when it presents itself and so that just doesn't occur as often."

Dr. Ward testified CSAAS "is helpful in understanding the dynamics involved when a child is involved in ongoing sexual abuse."  Ward said that "if a child has been sexually molested over and over again, a child may believe this is just how it is.  This is just what happens."  Ward testified "children are naive and they go into these situations over and over hoping and believing that this time will be different."  Ward said children "don't have . . . protective measures, like we would as adults."

### 3.  Application and Analysis

The prosecution introduced the testimony of Dr. Ward in order:  "to dispel common myths *concerning victim behavior*."  (Capitalization and boldfacing omitted, italics added.)  The trial court admitted the CSAAS evidence for that limited purpose, and Ward's testimony largely conformed to that purpose.  That is, Ward explained CSAAS and the five common behaviors of sexual abuse victims.

We find the bulk of Dr. Ward's expert testimony was sufficiently beyond the common experience of jurors, and therefore the trial court properly admitted the CSAAS evidence under well-established California law.  (See *People v. McAlpin*, *supra*, 53 Cal.3d at p. 1300 [CSAAS testimony is admissible to explain "common stress reactions of children who have been sexually molested"]; *People  v. Lapenias*, *supra*, 67 Cal.App.5th at pp. 173-174 [CSAAS testimony does not require a showing that it is generally accepted in the scientific community]; *People v. Munch*, *supra*, 52 Cal.App.5th at pp. 468-470 [CSAAS testimony "does not violate a defendant's right to due process"]; *People v. Perez* (2010) 182 Cal.App.4th 231, 245 [CSAAS testimony is admissible to rehabilitate a molestation victim's credibility]; *People v. Wells* (2004) 118 Cal.App.4th

10

179, 190 [CSAAS testimony "explained the five stages or components that have been clinically identified"]; *People v. Yovanov* (1999) 69 Cal.App.4th 392, 406-407 ["CSAAS was probative in explaining [the victim's] six-year delay in reporting the abuse to the police"]; *People v. Patino*, *supra*, 26 Cal.App.4th at pp. 1744-1745 [CSAAS testimony properly admitted during prosecution's case-in-chief rather than waiting for rebuttal].)

However, the prosecutor also asked: "Dr. Ward, is most sexual abuse by a family member or a stranger?"[1] That question elicited evidence about the identities of most sexual abusers, rather than testimony about how children typically react to sexual abuse (CSAAS). Although Ward's testimony arguably addressed an additional myth— that most sexual abusers are strangers to the children they abuse—that evidence was not within the purpose for which the trial court admitted the expert's testimony, which was specifically limited to CSAAS. (See *Bowker*, *supra*, 203 Cal.App.3d at pp. 393-394 ["it is the People's burden to identify the myth or misconception the evidence is designed to rebut"]; see also *People v. Sedano* (2023) 88 Cal.App.5th 474, 482-483 [evidence that most child sexual abusers are known to their victims addresses another common myth— stranger danger—that the danger of child sexual abuse largely comes from strangers].)

Thus, we find Dr. Ward's testimony about the identities of most sexual abusers was improperly admitted into evidence under the circumstances of this case. We now turn to the question of whether the improper admission of that portion of Ward's testimony requires a reversal of the judgment.

"A verdict or finding shall not be set aside, nor shall the judgment or decision based thereon be reversed, by reason of the erroneous admission of evidence unless: [¶] . . . . [¶] (b) The court which passes upon the effect of the error or errors is

---

[1] Although Rickard's counsel did not object to the prosecutor's question to Dr. Ward about the identity of most sexual abusers, we have chosen to address the merits of issue on appeal. (See *People v. Turner* (1990) 50 Cal.3d 668, 708-709 [court addressed merits of issue to forestall ineffective assistance of counsel claim].)

of the opinion that the admitted evidence should have been excluded on the ground stated and that the error or errors complained of resulted in a miscarriage of justice." (Evid. Code, § 353.) "The erroneous admission of expert testimony only warrants reversal if 'it is reasonably probable that a result more favorable to the appealing party would have been reached in the absence of the error.'" (*People v. Prieto* (2003) 30 Cal.4th 226, 247.)

Here, Dr. Ward testified most sexual abusers are family members or others who are "well known" to the children that they abuse. But we do not find it reasonably probable that had that evidence been excluded by the trial court, that the outcome of the trial would have been more favorable toward Rickard. In this case, Taylor testified in excruciating detail about the sexual abuse committed by Rickard over a period of many years. Further, Taylor's testimony concerning Rickard's request for oral sex was corroborated by evidence obtained from his cell phone.

Perhaps most importantly, corroborating evidence also came from Rickard's own statements during the covert phone call, in which Rickard essentially admitted that he had sexually abused Taylor. Again, Taylor said, "I want you to apologize and promise me you won't touch me, my vagina anymore." Rickard responded, "Okay, you got that, I apologize and I won't never ever do it ever again."

The trial court also properly instructed the jury about the proper use and the limitations of the expert testimony: "You have heard testimony from Dr. Jody Ward regarding child sexual abuse accommodation syndrome. [¶] *Dr. Ward's testimony about child sexual abuse accommodation syndrome is not evidence that the defendant committed any of the crimes charged against him.* [¶] You may consider this evidence only in deciding whether or not Taylor's conduct was not inconsistent with the conduct of someone who has been molested, and in evaluating the believability of her testimony." (CALCRIM No. 1193, italics added.) We presume the jury understood and followed the court's instructions. (See *People v. McKinnon* (2011) 52 Cal.4th 610, 670.)

12

In sum, we find no prejudicial evidentiary errors concerning the admission of the CSAAS testimony during Rickard's trial.


B.  *Prosecutorial Misconduct*

Rickard contends the prosecutor committed misconduct at two points during the closing argument.  We disagree.

We evaluate claims of prosecutorial misconduct/error under well-established standards.  "A prosecutor's conduct violates the Fourteenth Amendment to the federal Constitution when it infects the trial with such unfairness as to make the conviction a denial of due process.  Conduct by a prosecutor that does not render a criminal trial fundamentally unfair is prosecutorial misconduct under state law only if it involves the use of deceptive or reprehensible methods to attempt to persuade either the trial court or the jury." (*People v. Morales* (2001) 25 Cal.4th 34, 44.)

"'A prosecutor is held to a standard higher than that imposed on other attorneys because of the unique function he or she performs in representing the interests, and in exercising the sovereign power, of the state.'" (*People v. Hill* (1998) 17 Cal.4th 800, 819-820.)  However, "'the term prosecutorial "misconduct" is somewhat of a misnomer to the extent that it suggests a prosecutor must act with a culpable state of mind.  A more apt description of the transgression is prosecutorial error.'" (*People v. Centeno* (2014) 60 Cal.4th 659, 666-667.)

In reviewing a prosecutor's comments to the jury, "we must view the statements in the context of the argument as a whole." (*People v. Cole* (2004) 33 Cal.4th 1158, 1203.)  Generally, a prosecutor has "'wide latitude to discuss and draw inferences from the evidence at trial,' and whether 'the inferences the prosecutor draws are reasonable is for the jury to decide.'" (*Ibid*.)  The relevant question is "'whether there is a reasonable likelihood that the jury construed or applied any of the complained-of-

13

remarks in an objectionable fashion.'" (*Id.* at pp. 1202-1203.)

Generally, to raise an alleged error on appeal, the issue must have first been raised in the trial court. (*In re S.B.* (2004) 32 Cal.4th 1287, 1293 & fn. 2.) Specifically, a defendant forfeits a prosecutorial misconduct claim on appeal unless the defendant objected to the alleged misconduct when it occurred, and further asked the court to admonish the jury. (See *People v. Ervine* (2009) 47 Cal.4th 745, 806-807 (*Ervine*).)

Rickard claims the prosecutor committed misconduct during closing argument by (1) misstating the burden of proof, and (2) misstating the proper use of Dr. Ward's testimony. We shall analyze each claim.

### 1. The Burden of Proof

During the first portion of the prosecution's closing argument, the prosecutor reviewed the evidence and argued that each count had been proven beyond a reasonable doubt. During the defense portion of the closing argument, Rickard's counsel argued to the jurors that their obligation was to "look at this and say, 'I have an obligation to vote not guilty if Taylor's version of events does not satisfy me beyond a reasonable doubt.'" Counsel argued: "I think you'll find, when you look at it carefully, that this is a matter where there's much more than a reasonable doubt as to my client doing anything improper."

Rickard challenges on appeal the following italicized portion of the rebuttal phase of the prosecution's closing argument: "[Defense counsel] talked about the burden of proof and what the prosecutor has to do in a trial, prove each and every element beyond a reasonable doubt, and that is absolutely the case. *And that burden is a burden that is met by prosecutors in every courthouse in every city across this great country every day and it has been met here.*" (Italics added.)

Rickard argues "the prosecutor was appealing to the jury's passions by

14

connecting the greatness of the country to the meeting of the burden of proof, and also arguing, in essence, because some other prosecutors in other cases meet their burden, it has been met here."

Rickard did not object during the prosecution's closing argument, nor did he request a jury admonition, so this issue has been forfeited for purposes of appeal. (See *Ervine*, *supra*, 47 Cal.4th at pp. 806-807.) In any event, we find the prosecutor's comment did not improperly appeal to the juror's passions or lower the burden of proof. The prosecutor merely appeared to argue that the beyond a reasonable doubt standard is not an impossible standard to meet, and it had been satisfied in this case.

Further, the trial court properly defined the reasonable doubt standard to the jury during its instructions. As part of those instructions, the jurors were told that Rickard was presumed innocent, and it was the prosecution's burden to prove him guilty beyond a reasonable doubt. (See CALCRIM No. 220.) The jury was also instructed to ignore any of the attorney's comments that conflicted with the law as stated in the court's instructions. (See CALCRIM No. 200.) Again, we presume the jury understood and followed these instructions. (See *People v. McKinnon*, *supra*, 52 Cal.4th at p. 670.)

### 2. Dr. Ward's Testimony

During the opening phase of the closing argument, the prosecutor recapped Dr. Ward's testimony and the five stages of CSAAS. The prosecutor then argued:

"So how is this testimony important? It explains why someone might go back to the home of the abuser, in this case Taylor had no choice, did she, going to visit her dad every other weekend, why she would show affection to her abuser. The family may say, 'We didn't see anything going on. We would have known something.' No. Children will still show affection for that abuser. They take the good with the bad."

The prosecutor continued: "And, finally, why did Taylor wait so long to

15

tell someone?  That's right in line with what most children and adults do.  This type of abuse is not easy to talk about.  And many people wait years and years, if ever at all, to say anything."  The prosecutor argued Dr. Ward "knew nothing about this case, but the things she said were so spot on."  On appeal, Rickard objects to the next italicized portion of the argument:  "She did not know one thing about this case.  But these are common behaviors displayed by people who have been sexually abused and Taylor fit them *like a glove*."  (Italics added.)

Rickard argues that by making the "like a glove" comment, the prosecutor sought "to have the jury conclude that this 'match' supports the conclusion that Taylor C. was, in fact, sexually molested."

Once again, Rickard did not raise this objection at trial, so it has been forfeited for purposes of appeal.  (See *Ervine*, *supra*, 47 Cal.4th at pp. 806-807.)  In any event, we do not find the prosecutor's "like a glove" comment to be improper.  The jury was instructed to consider the CSAAS testimony for the limited purpose of "deciding whether or not Taylor's conduct was not inconsistent with the conduct of someone who has been molested, and in evaluating the believability of her testimony."  (CALCRIM No. 1193.)  The prosecutor's argument appeared to simply urge the jurors to compare Taylor's conduct to the five components of CSAAS in order to evaluate the believability of her testimony.  This argument was in harmony with the court's instructions to the jury.

In sum, we find no evidence of prosecutorial misconduct during the prosecutor's closing arguments.

## C.  Motion for Mistrial and/or a New Trial

Rickard contends the trial court erred by denying his motion for a mistrial and/or a new trial based on an officer's testimony on cross-examination that Rickard said he wanted to speak to counsel upon his arrest.  We disagree.

16

A motion for a mistrial is a request to terminate the trial before a verdict and it "is directed to the sound discretion of the trial court." (*People v. Jenkins* (2000) 22 Cal.4th 900, 985-986.) A mistrial should be granted when there has been "incurable prejudice." (*People v. Haskett* (1982) 30 Cal.3d 841, 854.) "Incurable prejudice" is a subjective judgment; therefore, the trial court is vested with broad discretion in ruling on a defendant's motion for a mistrial or a new trial. (*Ibid.*)

In *Doyle*, the United States Supreme Court held that "it would be fundamentally unfair and a deprivation of due process to allow the arrested person's silence to be used to impeach an explanation subsequently offered at trial." (*Doyle*, *supra*, 426 U.S. at p. 618; *People v. Schindler* (1980) 114 Cal.App.3d 178, 188 [the same rule applies to "a defendant's request for counsel"].)

However, the United States Supreme Court later clarified that in order to establish *Doyle* error, the defendant must demonstrate that the prosecution actually used his postarrest silence for impeachment purposes and that the trial court "permitted" its use. (*Greer v. Miller* (1987) 483 U.S. 756, 761-765.) That is, there must be an affirmative act by the trial court to consider and allow the postarrest silence evidence, which "will usually take the form of overruling a defense objection, thus conveying to the jury the unmistakable impression that what the prosecution is doing is legitimate." (*People v. Evans* (1994) 25 Cal.App.4th 358, 368.)

Here, the officer stated on cross-examination that Rickard had asked for an attorney following his arrest. But the prosecution did not invite the officer's testimony, nor did the prosecutor make any subsequent mention of it. Further, the court offered to admonish the jury to disregard the brief comment; therefore, the officer's testimony did not constitute a *Doyle* error. (See *Greer v. Miller*, *supra*, 483 U.S. at pp. 761-765.)

Thus, we hold that the trial court correctly denied the mistrial motion based on alleged *Doyle* error, as well as the new trial motion made on the same ground.

*D. Cumulative Prejudice*

Rickard contends the cumulative prejudice of the foregoing alleged errors compels reversal of his convictions. We disagree.

"In theory, the aggregate prejudice from several different errors occurring at trial could require reversal even if no single error was prejudicial by itself." (*In re Reno* (2012) 55 Cal.4th 428, 483, superseded by statute on other grounds as stated in *In re Friend* (2021) 11 Cal.5th 720, 728.) However, the rejection of each of a defendant's individual claims "cannot logically be used to support a cumulative error claim [where] we have already found there was no error to cumulate." (*In re Reno*, at p. 483.)

Here, we found Rickard was not prejudiced by Dr. Ward's testimony that most sexually abused children are abused by family members, or people that are well known to the child. We found no further errors. Therefore, there is no additional prejudice to aggregate and/or analyze.


III

DISPOSITION

The judgment is affirmed.


MOORE, J.

WE CONCUR:


O' LEARY, P. J.


GOETHALS, J.

18