Filed 4/24/13  P. v. Kennedy CA2/3

## NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION THREE

| | |
|---|---|
| THE PEOPLE,<br><br>    Plaintiff and Respondent,<br><br>    v.<br><br>CRYSTAL KENNEDY,<br><br>    Defendant and Appellant. | B236815<br><br>(Los Angeles County<br>Super. Ct. No. BA369059) |
| In re CRYSTAL KENNEDY,<br><br>    on Habeas Corpus. | B243878 |

APPEAL from a judgment of the Superior Court of Los Angeles County, John Fisher, Judge.  The judgment is modified and, as modified, affirmed.

PETITION for writ of habeas corpus.  Denied.

Alex Coolman, under appointment by the Court of Appeal, for Defendant, Appellant, and Petitioner.

Kamala D. Harris, Attorney General, Dane R. Gillette, Chief Assistant Attorney General, Lance E. Winters, Assistant Attorney General, Steve E. Mercer, Marc A. Kohm and James William Bilderback II, Deputy Attorneys General, for Plaintiff and Respondent.

## INTRODUCTION

A jury found defendant and appellant Crystal Kennedy guilty of aggravated mayhem. She filed an appeal and a petition for writ of habeas corpus.[1] In her appeal, Kennedy contends that character evidence was improperly admitted; that the jury was misinstructed on the law of aggravated mayhem; and that the prosecutor committed misconduct by commenting on her Sixth Amendment right to counsel. In the habeas petition, she claims that her trial counsel was ineffective because he failed to call certain witnesses and failed to object to evidence and statements made by the trial court and the prosecutor. Although the judgment must be modified to correct a sentencing error, we reject all other contentions, deny the petition, and affirm the judgment as modified.

## FACTUAL AND PROCEDURAL BACKGROUND

### I.     Factual background.

#### A.     *Prosecution case.*

On March 7, 2010, Leontinae Layton spent the night with Terry Williams at a house belonging to Kennedy's brother, Aaron Owens. In the morning, Owens woke Layton and Williams. Layton began dressing, and Owens told her to hurry. Layton got her bag and shoes, but Owens and Williams continued to urge her to go. Owens led Layton out the back door, and then Owens went back inside, leaving Layton alone.

While Layton was putting on her shoes outside, Kennedy, who seemed "antsy or irritated" or "a little aggravated" came out through the back door of the house and demanded to know what Layton was doing there and who she was. Having never seen Kennedy before, Layton answered that it didn't matter who she was and demanded back, " 'Who are you' " and " 'What's going on?' "

Kennedy went back into the house. Confused and a little scared because she "didn't know what the situation could escalate to," Layton stayed outside. Her hand behind her back, Kennedy returned and said, " 'I'm going to ask you this one more time. Who are you and what are you doing here?' " Layton told her it " 'doesn't matter who I

---

[1]     We issued an order to show cause and ordered the appeal and the habeas petition to be heard together.

am.  I'm just here kicking it with the homies.' "  Kennedy said, " 'No you're not, you lying bitch.  You here to fuck my nigger.' "  Taking her hand from behind her back, Kennedy hit Layton's head with a glass cup she'd been concealing.  When the cup didn't break, Kennedy broke it on a nearby pole.  She proceeded to fight Layton, who fought back.[2]  With the hand holding the glass, Kennedy kept up a "constant action of hitting."  When Layton fell, Kennedy came from behind her and hit the back of Layton's head, cutting through the hood of Layton's sweatshirt.  Layton had no weapon and was never able to get the glass from Kennedy.

As she struggled to get up, Layton felt blood dripping down her face and she screamed for help.  Owens pulled Kennedy off Layton.  Layton went back inside the house, locked herself in the bathroom, and, disregarding Williams's pleas not to call the police, called 911 and said that a "girl" "broke a glass" and cut her.

Layton sustained cuts to the back of her head, face, arm, back, and hand.  Part of the skin from her face had been peeled off.

About two months after the incident, Kennedy was arrested on May 10, 2010.  The arresting officer did not notice any injuries or scars on Kennedy's face or body.

About six years before this incident, Kennedy was involved in an altercation on November 21, 2003 with her then boyfriend.  Kennedy told the arresting officer, " 'I got mad because my man was talking with that bitch.  So we started fighting and I bit him.' "  The parties stipulated that Kennedy was convicted of misdemeanor battery in connection with this incident.

B.    *Defense case.*

Williams testified that he and Layton were at a party where they drank alcohol.  They went to Owens's house, and Layton brought an overnight bag that had a drinking glass in it.  The next morning, Owens told Williams that someone was at the door.  Afraid it was his girlfriend, Kennedy, Williams told Layton to get dressed and go out the back door.  When Layton left, she had her shoes on.  Williams was putting his clothes on when

---

[2]    Layton was unsure whether she punched or kicked defendant first once she saw defendant "rush[ing]" her, glass cup in hand.

Layton, saying something about " 'some girl,' " ran past him into the bathroom. He did not discourage her from calling the police. Later that day, Williams saw Kennedy, whose forehead was injured. Kennedy said that she got into a fight with a girl, who cut her with some glass. He took photographs of Kennedy's injuries at defense counsel's instruction, and, at trial, he identified them (Defense Exhibits A-E).[3]

Kennedy testified that after leaving a club she went to Owens's house to use the bathroom. When there was no answer at the front door, she went to the back. Seeing Layton, Kennedy asked who she was and what she was doing there. Layton told her not to worry " 'about who am I. Who the fuck are you?' " When Kennedy demanded to know what Layton was doing there, Layton told her she was with her " 'boyfriend Terry,' " to which Kennedy replied, " 'Your boyfriend Terry? That's my nigger, bitch.' "

Layton then punched Kennedy's face, and Kennedy punched her back. Layton took a glass from her bag, broke it, and cut Kennedy's back. They "tussl[ed]" for the object, but Kennedy was never able to get the glass from Layton. She never intended to break a glass cup and cut or deface Layton, but that happened while they were fighting. Hurt and scared, Kennedy left. She didn't see a doctor that day and she did not call the police. But she had Williams take a picture of her injuries and she called a defense attorney on the same day she fought with Layton.

About two weeks after the altercation with Layton, Kennedy saw Dr. David Kim on March 26, 2010 to assess her injuries and to document them. According to Dr. Kim, Kennedy had seven healing wounds on her back, face and chest. Kennedy told Dr. Kim that she was injured during an altercation at a club. At trial, Dr. Kim did not recognize a cut on Kennedy's back, depicted in Defense Exhibit D. He said such a cut would have required sutures.

---

**3** Defense Exhibit D shows an open wound, but the photograph is cropped so that the person's head is not in the picture.

**II.     Procedural background.**

On January 28, 2011, a jury found Kennedy guilty of count 1, aggravated mayhem (Pen. Code, § 205).[4]

On October 12, 2011, after denying Kennedy's motion for new trial, the trial court sentenced Kennedy to life with the possibility of parole. The court imposed but stayed under section 654 a one-year term for the great bodily injury enhancement.

## DISCUSSION

**I.     The admission of Kennedy's prior battery under Evidence Code section 1101, subdivision (b).**

Kennedy contends that evidence of her 2003 battery conviction was inadmissible under Evidence Code sections 1101, subdivision (b), and 352, because it merely showed her propensity for violence. We disagree.

**A.     *Additional facts.***

Over Kennedy's objection, the prosecutor was allowed to introduce evidence of Kennedy's 2003 prior battery conviction. Although the defense argued that the evidence was unduly prejudicial and was improper propensity evidence, the trial court found that the evidence would be relevant to rebut a claim of self-defense. The court also agreed with the prosecutor that it was relevant to Kennedy's intent and motive, under Evidence Code section 1101, subdivision (b). To alleviate the possibility of prejudice, however, the trial court found that the prosecutor could introduce the evidence in rebuttal only if Kennedy first put on evidence of self-defense.

Los Angeles County Deputy Sheriff Paul Morales then testified that, on November 21, 2003, he responded to a possible assault. Kennedy told him she " 'got mad because my man was talking with that bitch. So we started fighting and I bit him.' " Kennedy, however, denied biting her boyfriend and getting mad at him because he was talking to another woman. She pled no contest to battery on her boyfriend.

---

[4]     All further undesignated statutory references are to the Penal Code.

With respect to this evidence, the trial court instructed the jury: " 'The prosecution presented evidence that [Kennedy] committed another offense or certain behavior on an earlier occasion involving an allegation of battery on another person by biting. [¶] So you may consider this evidence only if the prosecution has proved by a preponderance of the evidence that [Kennedy], in fact, committed this earlier uncharged act or offense. [¶] . . . [¶] If you decide that [Kennedy] committed the uncharged act or offense you may, but are not required to, consider that evidence for the limited purpose of deciding whether or not—and then we give you the following scenario: That [Kennedy] acted with the intent to commit the crimes alleged in this case, that [Kennedy] had a motive to commit the offense alleged in this case or that [Kennedy] reasonably and in good faith believed that she could use self-defense in this case. [¶] In evaluating this evidence consider the similarity or lack of similarity between the uncharged earlier act or offense and the charged offense. [¶] Do not consider this evidence for any other purpose except for the limited purposes of which I just stated, those three categories, intent, motive and the issue of reasonableness of self-defense. [¶] Do not conclude from this evidence that [Kennedy] had a bad character or is disposed to commit crime. [¶] If you conclude at that time [Kennedy] committed the uncharged offense or act, that earlier situation, that conclusion is only one factor to consider along with all the other evidence.' "

During closing argument, the prosecutor commented on the prior incident: "[T]hey're extremely similar circumstances to the incident in November of 2003 which helps to inform what [Kennedy's] motive and intent was. And it helps to inform the fact that this wasn't a self-defense case, that [Kennedy] attacked. Why? [¶] In November of 2003 when she went to her then boyfriend's home and saw him speaking, just speaking to a strange woman, a woman she didn't recognize, she attacked. That was enough to trigger her. [¶] This is clearly someone who in that situation was not acting in self-defense. And under the same circumstances here faced with a situation where her man is with a strange woman and even worse, in her own brother's house, what does she do? She attacked again. Why? Jealousy." Later, the prosecutor added, "[Kennedy], on the

6

other hand, has the same motive she did in 2003.  Jealousy.  She has the same exact motive."

In rebuttal argument, the prosecutor said:  "I agree with counsel you do not convict a person because they have been convicted before.  The purpose of presenting [Kennedy's] 2003 conviction and the facts underlying it have nothing to do with getting you to convict her solely based on that.  [¶]  It goes to inform what her intent, what her motive was and whether or not this is likely to be self-defense.  That's what that evidence goes to.  And specifically when faced with similar circumstances[,] boyfriend, strange woman, [Kennedy] attacked.  [¶]  And here you have the exact same situation.  And one thing that the defense counsel said is that that was eight years ago.  Well, all that means is that nothing much has changed."

B.       *The trial court did not abuse its discretion by admitting the other crimes evidence.*

Character evidence is generally inadmissible to prove a person acted in conformity with it on a specific occasion.  (Evid. Code, § 1101, subd. (a).)  It therefore is inadmissible to establish criminal propensity.  (*People v. Demetrulias* (2006) 39 Cal.4th 1, 14.)  It may be admissible, however, where relevant to prove a material fact at issue, for example, motive, opportunity, intent, preparation, plan, knowledge or identity.  (Evid. Code, § 1101, subd. (b).)  "The admissibility of other crimes evidence depends on (1) the materiality of the facts sought to be proved, (2) the tendency of the uncharged crimes to prove those facts, and (3) the existence of any rule or policy requiring exclusion of the evidence."  (*People v. Carpenter* (1997) 15 Cal.4th 312, 378-379, superseded by statute on other grounds as stated in *Verdin v. Superior Court* (2008) 43 Cal.4th 1096, 1106.)  As the court explained in *People v. Ewoldt* (1994) 7 Cal.4th 380, at page 402:  "The least degree of similarity (between the uncharged act and the charged offense) is required . . . to prove intent.  [Citation.]  '[T]he recurrence of a similar result . . . tends (increasingly with each instance) to negative accident or inadvertence or self-defense or good faith or other innocent mental state, and tends to establish (provisionally, at least, though not certainly) the presence of the normal, i.e., criminal, intent accompanying such an

7

act . . . .' [Citation.] . . . [T]o be admissible to prove intent, the uncharged misconduct must be sufficiently similar to support the inference that the defendant ' "probably harbor[ed] the same intent in each instance." [Citations.]' "

Even if evidence of an uncharged crime is admissible under Evidence Code section 1101, subdivision (b), the evidence may be excluded under Evidence Code section 352 if its probative value is substantially outweighed by the probability its admission would unfairly prejudice the defendant, mislead the jury, or confuse the issues. (*People v. Abilez* (2007) 41 Cal.4th 472, 500; *People v. Balcom* (1994) 7 Cal.4th 414, 426-427.) A trial court's ruling to admit evidence of an uncharged crime under Evidence Code sections 1101, subdivision (b), and 352, is reviewed on appeal under the abuse-of-discretion standard. (*People v. Memro* (1995) 11 Cal.4th 786, 864, overruled on other grounds in *People v. Gaines* (2009) 46 Cal.4th 172, 181, fn. 2.)

The trial court here found that the November 2003 incident was admissible because Kennedy claimed self-defense. Self-defense required Kennedy to actually and reasonably believe in the need to defend. (*People v. Humphrey* (1996) 13 Cal.4th 1073, 1082.) Kennedy clearly placed at issue her subjective intent in fighting and cutting Layton by testifying that Layton was the aggressor and threw the first punch. Kennedy's prior battery against a boyfriend who was talking to another woman suggests that jealousy, and not a need for self-defense, motivated her attack against her boyfriend in 2003 and her current attack against Layton, who had just spent the night with Kennedy's boyfriend. Evidence of the prior battery therefore was admissible to establish Kennedy's motive and intent, in that it disproved her self-defense claim. (See, e.g., *People v. Demetrulias, supra,* 39 Cal.4th at pp. 14-15 [prior assault and robbery tended to show that the defendant stabbed current victim to take his money rather than to defend himself]; *People v. Ewoldt, supra,* 7 Cal.4th at p. 402; *People v. Simon* (1986) 184 Cal.App.3d 125, 130 [evidence that a prior crime was motivated by jealousy could make

8

it admissible to show that a current crime was similarly motivated by jealousy rather than by self-defense].[5])

Kennedy argues, however, that the dissimilarity between the prior and current crimes rendered the evidence inadmissible. The prior and current crimes were dissimilar in that Kennedy committed the prior act against her then boyfriend and she committed the current act against "the other woman." But "the probativeness of other-crimes evidence on the issue of motive does not necessarily depend on similarities between the charged and uncharged crimes, so long as the offenses have a direct logical nexus." (*People v. Demetrulias, supra,* 39 Cal.4th at p. 15.) The crimes need only be sufficiently similar to support an inference that defendant probably harbored the same intent in each instance. (*Ibid.*) In both instances, there was evidence that Kennedy discovered a boyfriend cheating on her. These circumstances were sufficiently similar to support the inference that jealousy motivated Kennedy both times.

We also reject the argument that the trial court abused its discretion under Evidence Code section 352. The prior 2003 battery was not particularly inflammatory in comparison to the current crime. In 2003, the evidence was that Kennedy bit her boyfriend, as compared with the disfigurement of Layton in the current case. The trial court, cognizant of the possibility of prejudice and to minimize it, specifically ruled that the other crimes evidence could not come in until Kennedy introduced evidence of self-defense. The court gave a very specific limiting instruction telling the jury that the prior crime could only be considered on the issues of Kennedy's "intent, motive and the issue of reasonableness of self-defense." The jury was not to "conclude from this evidence that the defendant had a bad character or is disposed to commit crime." We presume that the jury understood and followed this instruction. (*People v. Gray* (2005) 37 Cal.4th 168, 231.)

---

[5] *Simon* reversed the defendant's conviction because the other crimes evidence had been admitted without first establishing a preliminary fact; namely, whether there was sufficient evidence jealousy motivated the prior act. (*People v. Simon, supra,* 184 Cal.App.3d at pp. 130-132.)

Under these circumstances, the trial court did not abuse its discretion in admitting the prior 2003 battery. And, to the extent Kennedy argues that admission of the evidence violated her right to due process, a state court's application of ordinary rules of evidence, including the rule stated in Evidence Code section 352, generally does not infringe upon this right. (*People v. Cornwell* (2005) 37 Cal.4th 50, 82, disapproved on another ground by *People v. Doolin* (2009) 45 Cal.4th 390, 421, fn. 22.)

## II.     The admission of other character evidence.

Kennedy next argues that the trial court let in additional, inadmissible character and propensity evidence when it overruled her trial counsel's objection to statements Layton made that Williams should have known Kennedy was "crazy" and could "flip." We conclude that Kennedy was not prejudiced by the admission of these statements.

During Layton's 911 call, she told Williams he should have known this would happen. When the prosecutor asked Layton why she said that, Layton explained: "From my understanding at that point she was his ex-girlfriend because, I mean, no one would just go crazy like this if what she was saying—if she was saying or she had to be his girlfriend or something. [¶] And from my understanding he told me that he didn't have a current girlfriend. So if this is your ex-girlfriend you know how she is. You know she's crazy. You know that she can flip at any second." Defense counsel objected that the evidence lacked foundation, but the court overruled the objection and said, "It's just her statement. That's not necessarily offered for the truth. It's just a conversation they're having." Layton added, "You would know. If you've been in a relationship with someone you know how they are." Defense counsel stated, "[o]bjection," and it was again overruled.

The prosecutor then referenced during closing argument Layton's remarks: "And remember what the victim said? At one point in the 911 call the victim, who at that point is speaking to [Williams], says to him, 'You should have known this was going to happen. You should have known this was going to happen.' [¶] And when she was asked, 'Why did you say that to him.' What did she say? She said, 'I said that because look. If you have been with this woman, if she's really your ex-girlfriend you should

10

have known how she would react if she found you with another woman. You should have known.' "

On appeal, Kennedy argues that the foundation objection was well-taken, because Layton's statements "about [defendant's] character were pure speculation, and had no probative value" and had the effect of suggesting that Kennedy had a propensity for violence. She also contends its admission violated her right to due process.

Regardless of its admissibility, Kennedy was not prejudiced by admission of Layton's statement, whether we review the issue under *People v. Watson* (1956) 46 Cal.2d 818, 836 [whether it is reasonably probable that a result more favorable to the appellant would result in the absence of the error], or under *Chapman v. California* (1967) 386 U.S. 18, 24 [whether the error was harmless beyond a reasonable doubt]. Layton's statement to Williams that he should have known this could happen, that Kennedy was "crazy" and could "flip at any second" had very little probative value. Beyond that one encounter, Layton did not know Kennedy, and therefore could not speak to Kennedy's propensity for violence. It therefore did not expand on any theme that Kennedy had a history of jealous rage, because Layton had no such knowledge of that history.

## III.    CALCRIM No. 800.

Kennedy makes two contentions concerning CALCRIM No. 800, the instruction on aggravated mayhem: the instruction misstated the elements of the crime and lowered the People's burden of proof and the trial court misstated the elements of the crime during voir dire.

### A.    *CALCRIM No. 800 does not misstate the law on aggravated mayhem.*

When a criminal defendant contends that an ambiguous or potentially misleading instruction violated his or her federal constitutional right to a trial by jury, we must review the instructions as a whole and determine " 'whether there is a reasonable likelihood that the jury has applied the challenged instruction in a way' that violates the Constitution. [Citation.]" (*Estelle v. McGuire* (1991) 502 U.S. 62, 72; see also *People v. Smithey* (1999) 20 Cal.4th 936, 963; *People v. Frye* (1998) 18 Cal.4th 894, 957,

11

disapproved on another point in *People v. Doolin, supra,* 45 Cal.4th at p. 421.) If an instruction omits or improperly describes an element of the offense, preventing the jury from making a necessary factual finding, it is constitutionally defective and subject to the *Chapman* standard of review. (*People v. Williams* (2001) 26 Cal.4th 779, 790.)

Without objection from either party, the trial court here instructed the jury on aggravated mayhem: " 'To prove the defendant is guilty of this crime the prosecution must prove that, one, the defendant unlawfully and maliciously disfigured someone permanently. [¶] Two, when the defendant acted[,] she intended to permanently disfigure the other person. [¶] *And, three, under the circumstances the defendant's act showed extreme indifference to the physical or psychological wellbeing of the other person.* [¶] Someone acts maliciously when he or she intentionally does a wrongful act or when he or she acts with the unlawful intent to annoy or injure someone else. [¶] A disfiguring injury may be permanent even if it can be repaired by medical procedures.' "[6] (Italics added.)

The problem with this instruction, defendant argues, is it directed the jury to consider whether her *act* showed indifference to the well-being of another person as opposed to whether the *circumstances in which defendant acted* demonstrated such indifference. Thus, the trial court should have, as defense counsel requested below, instructed with this: "Aggravated mayhem requires the specific intent to cause the maiming injury. [¶] Evidence that shows no more than an indiscriminate attack is insufficient to prove the required specific intent. [¶] Furthermore, specific intent to

---

[6] The jury was also instructed on simple mayhem (§ 203). " 'To prove the defendant is guilty of mayhem the prosecution must prove that the defendant caused serious bodily injury when she unlawfully and maliciously permanently disfigured someone. [¶] Someone acts maliciously when he or she intentionally does a wrongful act or when he or she acts with the unlawful intent to annoy or injure someone else. [¶] . . . [A] serious bodily injury means a serious impairment of physical condition. Such an injury may include, but is not limited to, protracted loss or impairment of function or any bodily member or organ or a wound requiring extensive suturing and serious disfigurement. [¶] A disfiguring injury may be permanent even if it can be repaired by medical procedures.' "

12

maim may not be inferred solely from evidence that the injury inflicted actually constitutes mayhem. [¶] Instead, there must be other facts and circumstances which support an inference of intent to maim rather than to attack indiscriminately."[7] (See also *People v. Park* (2003) 112 Cal.App.4th 61, 64; CALCRIM No. 800 Use Notes.)

Under section 205, "[a] person is guilty of aggravated mayhem when he or she unlawfully, under circumstances manifesting extreme indifference to the physical or psychological well-being of another person, intentionally causes permanent disability or disfigurement of another human being or deprives a human being of a limb, organ, or member of his or her body." "Aggravated mayhem requires proof the defendant specifically intended to maim—to cause a permanent disability or disfigurement. [Citation.] A jury may not find specific intent 'solely from evidence that the injury inflicted actually constitutes mayhem; instead, there must be other facts and circumstances which support an inference of intent to maim rather than to attack indiscriminately.' [Citation.] 'A jury may infer a defendant's specific intent from the circumstances attending the act, the manner in which it is done, and the means used, among other factors.' [Citation.] '[E]vidence of a "controlled and directed" attack or an attack of "focused or limited scope" may provide substantial evidence of' a specific intent to maim. [Citations.]" (*People v. Szadziewicz* (2008) 161 Cal.App.4th 823, 831; see also *People v. Ferrell* (1990) 218 Cal.App.3d 828, 834.)

We do not agree that CALCRIM No. 800 invited the jury to focus on Kennedy's "act" to show extreme indifference to Layton's well-being as opposed to the "circumstances" attending the act. If the instruction could be interpreted to direct the jury to consider merely whether her act showed extreme indifference, then the phrase "under the circumstances" would be superfluous. But the qualifying phrase, "Under the circumstances," clearly tells the jury to consider the surrounding context in which the act occurred. Such context would be, for example, the manner in which Kennedy came across Layton in the backyard, the exchange of words between Layton and Kennedy

---

[7]     The trial court refused to give this requested instruction without comment.

before the physical attack began, Kennedy's return to the house to get a glass, and Kennedy deliberately breaking the glass on a pole.

Thus, the instruction as given was correct. The additional language requested by the defense, although also legally correct, was duplicative, and therefore the trial court did not err by refusing to give it. (See *People v. Coffman and Marlow* (2004) 34 Cal.4th 1, 99 [a trial court need not give a pinpoint instruction if merely duplicates other instructions].)

B.      *The trial court's statements during voir dire did not invite the jury to ignore applicable law.*

In a related argument concerning the law on aggravated mayhem, Kennedy contends that the trial court lowered the People's burden of proof by misstating, during voir dire, the law on aggravated mayhem. We disagree.

At the outset of voir dire, the trial court told the prospective jurors: "The defendant is charged with what we call mayhem or in lay terms an assault using, like, a piece of glass or a broken bottle on another female where there's an allegation that injuries occurred to the face, like, cuts and stitches and that kind of thing. [¶] So the defendant has pled not guilty to assaulting, for lack of a better word, this other person." Then the trial court told the jury that the "prosecution always goes first[,] so [the prosecutor] is going to call her witnesses. She has that burden of proof to go forward. She's saying that the defendant did this, you know, attack on another person with the glass, the broken glass, and they got to prove it. So they go first." Later, the trial court said, "[Defendant is] charged with what we call mayhem. That's the technical name for it. The allegation is that she with, like, a broken glass bottle or some object like that attacked another female and slashed—made some slashes in that person's body or face area causing injury."

Kennedy argues that these comments encouraged the prospective jurors to disregard the elements of aggravated mayhem and lowered the burden of proof by stating that Kennedy was on trial merely for "mayhem" rather than aggravated mayhem; by likening the charge to assault; and by omitting elements of the crime when describing

14

aggravated mayhem. The comments did no such thing. First, the comments were clearly not intended to be a substitute for the formal instructions, which we have either found to be legally correct or to which Kennedy asserts no challenge. (*People v. Avila* (2009) 46 Cal.4th 680, 716 [comments trial court made about mitigating evidence were not intended to be a substitute for full instructions at the end of the trial].) The trial court clearly conveyed that it was merely giving a shorthand overview of the case. Second, the court's abbreviated reference to the crime as "mayhem" or "assault" rather than "aggravated mayhem" could hardly have induced the jury to disregard the specific intent element in the latter when the prospective jurors, at that point in voir dire, had received no instructions on the elements of any crime and the trial court did not discuss the intent element. Third, the court was trying to give the jury a simple and abbreviated sense of what is aggravated mayhem—a crime many outside the criminal legal world are likely unfamiliar with—by saying it was, here, an attack with glass. By omitting the full and complete elements of the crime, such as disfigurement, the trial court was in no way encouraging the jury to ignore them. (Cf. *People v. Johnson* (2004) 119 Cal.App.4th 976 [trial court's repeated misstatements about the reasonable doubt standard, which misstatements the prosecutor echoed in closing arguments, required reversal of the judgment].)

We therefore reject the notion that the trial court's brief and innocuous comments violated Kennedy's right to due process and rendered her trial fundamentally unfair. Because we reject her contentions concerning the effect of the court's comments, we also reject her claim that her trial counsel provided ineffective assistance of counsel by failing to object to them.[8] We have found no error, and therefore Kennedy cannot have been prejudiced by any inaction on her trial counsel's part. (*Strickland v. Washington* (1984) 466 U.S. 668, 694; *People v. Holt* (1997) 15 Cal.4th 619, 703.)

---

[8] Defendant also raises this ineffective assistance of counsel claim in her habeas petition.

## IV.  Prosecutorial misconduct.

Kennedy contends that statements the prosecutor made during closing argument about her calling a defense attorney after the incident were impermissible comments on her Sixth Amendment right to counsel, and the comments violated her due process rights. We disagree.

### A.  *Additional facts.*

During the defense case, defense counsel asked Williams, Kennedy's boyfriend, why he took photographs of her injuries. Williams said he took the photographs at defense counsel's instruction. Thereafter, defense counsel asked Kennedy if at some point she or Williams gave him the photographs, and Kennedy answered that she gave defense counsel the photographs "[r]ight after the incident occurred." While cross-examining Kennedy, the prosecutor asked if, on the same day of the incident, she "didn't call the police," "didn't go to the hospital," and "didn't go to a doctor," but "you got a defense attorney[?]"

During closing arguments, the prosecutor commented on Kennedy's immediate consultation with an attorney after the altercation with Layton:

- "What does the person who is guilty look like and sound like? Looks like nothing. Sounds like nothing because she fled, because she didn't turn herself in to the police and because the only person that she called . . . was the defense attorney." Defense counsel interjected an objection (no grounds were stated), but it was overruled.

- "So common sense. What does a person who claims to be the victim, what does someone who's just been attacked in the home of her own brother do if they've run away in pain and in fear for their life? They call the police. But she didn't. [¶] She's in pain from her injuries. So you go to the doctor or the hospital. But she didn't. [¶] What did the defendant do? She called the defense attorney. Reasonably this doesn't make any sense. If the defendant wants you to believe that she was—she was the victim, that she

was attacked in her own brother's house, that she was in pain and in fear for her life, then her reaction to that is entirely inconsistent."

- The prosecutor asked the jury to reject as unreasonable "that a victim would run away, remain out on a warrant, call a defense attorney [that] same day, not go to the hospital, not call the police."

- After arguing that the victim behaved consistently with the truth, the prosecutor contrasted the victim's behavior with Kennedy's: "What did the defendant do? She didn't call 911. She called the defense attorney. She called the defense attorney. [¶] Why do you call a defense attorney after an attack if you're the victim? Why? Because you're not a victim. You call a defense attorney because you know you're in trouble, because you know you're guilty."

- Returning to this theme in her rebuttal argument, the prosecutor said: "The arguments that were presented to you on my closing about the fact that the defendant got a defense lawyer the day that this happened, about the fact that she only went to a doctor 19 days or 20 days later after speaking to her counsel, those have nothing to do with defense counsel. He's doing his job. [¶] And I have no idea what he told her or didn't tell her to do, but I know what she told us. She told us she admitted that she went and called the defense counsel after this happened. The victim called 911. The guilty person called the defense counsel. It's logic. [¶] Why didn't Ms. Layton call a defense attorney? Because she didn't need one. Because she's the victim. Because she didn't do anything wrong. And none of that has anything to do with defense counsel."

- "If you flee a location because you're in pain and you think you've been attacked and you have no idea that the police are looking for you or that you're in any way a defendant why do you get a defense attorney? [¶] Why do you take photographs at the request of a defense attorney? [¶] . . . [¶] If you don't have any clue that you're going to be on the defense

17

you wouldn't be building up a defense. It just doesn't make any sense. And, again, it's not about defense counsel. It's not about him. It's certainly not about me. This case has nothing to do with either one of us. It has to do with the defendant's actions and the fact that in every step her actions scream consciousness of guilt."

B.    *The prosecutor's comments on Kennedy's right to counsel.*

In all criminal prosecutions, the accused shall enjoy the right to have the assistance of counsel for his or her defense. (U.S. Const., 6th Amend.; Cal. Const., art. 1, § 15.) A prosecutor therefore may not comment on a defendant's post-arrest invocation of right to counsel without potentially violating the defendant's constitutional rights to due process and against self-incrimination. (See, e.g., *People v. Schindler* (1980) 114 Cal.App.3d 178, 185.) A prosecutor similarly may not suggest to the jury that a defendant's *pre-arrest* retention of counsel is inconsistent with innocence without potentially violating the defendant's due process guarantee of a fair trial under the Fourteenth Amendment. (See, e.g., *People v. Fabert* (1982) 127 Cal.App.3d 604; *United States ex rel. Macon v. Yeager* (3d Cir. 1973) 476 F.2d 613 (*Macon*); *State v. Angel T.* (2009) 292 Conn. 262, 278, 281-282 [973 A.2d 1207].)

The prosecutor here repeatedly commented during closing argument on Kennedy's pre-arrest retention of counsel, suggesting that she hired an attorney because she was guilty and that doing so was inconsistent with innocence but consistent with a "consciousness of guilt." Comments much milder than this have required convictions to be reversed. In *Macon*, for example, there was evidence that after the defendant shot the victim, he consulted his attorney. (*Macon*, *supra*, 476 F.2d at p. 614.) The prosecutor, in his summation to the jury, asked whether this was an "act of innocence?" (*Ibid.*) Relying on *Griffin v. California* (1965) 380 U.S. 609, which held that a prosecutor's suggestion that the jury could infer guilt from the defendant's failure to take the stand violated the defendant's Fifth Amendment right against self-incrimination, *Macon* said: "For the purpose of the 'penalty' analysis, however, we perceive little, if any, valid distinction between the privilege against self-incrimination and the right to counsel. It can be

18

argued, with equal vigor and logical support, as to either the *Griffin* situation or the present case, that a prosecutor's comment seeking to raise in the jurors' minds an inference of guilt from the defendant's constitutionally protected conduct constitutes a 'penalty' on the free exercise of a constitutional right." (*Macon,* at p. 615.)

This division cited *Macon* with approval in *People v. Schindler, supra,* 114 Cal.App.3d 178. In *Schindler*, the defendant killed her husband, who had killed his first wife. To counter the defendant's defense of diminished capacity, the prosecutor elicited evidence that the defendant hired as her defense attorney the man who had prosecuted her husband for the murder of his first wife. (*Id.* at p. 183.) In closing arguments, the prosecutor argued that the defendant's intentional selection of defense counsel negated her alleged "panic state" and showed her guilt. (*Id.* at pp. 184-185.)

*Schindler* concluded that "defendant clearly was impermissibly penalized for exercising her constitutional right to counsel by the prosecutor's flagrantly improper argument that the time and circumstances surrounding her selection of this particular defense counsel . . . impeached her testimony and showed she was guilty of murder." (*People v. Schindler, supra,* 114 Cal.App.3d at p. 189.) Because the only issue at trial was the defendant's intent and mental capacity at the time the crime was committed, and the inadmissible evidence and improper argument went directly to this issue, the error was prejudicial. (*Id.* at p. 190; see also *People v. Fabert, supra,* 127 Cal.App.3d at p. 610 ["comments that penalize the defendant for the exercise of her right to counsel, and that also strike at the core of her defense, cannot be considered harmless error"]; but see *People v. Coffman and Marlow, supra,* 34 Cal.4th at p. 66 [brief and mild reference to the defendant's invocation of his right to counsel was harmless error]; *People v. Huggins* (2006) 38 Cal.4th 175, 199.)

The prosecutor's comments here equating Kennedy's consultation with a defense counsel with guilt would clearly constitute a "penalty" on Kennedy's constitutional right to counsel, but for one crucial distinction between this case and the authorities we have cited: *Kennedy* first injected her hiring of defense counsel into the case. While examining Williams, defense counsel asked why he took the photographs of Kennedy:

"Q. Okay. And was there—how is that you decided to take the photograph? [¶] Why did you take the photograph?

"A. Why did I take the photograph?

"Q. Yes.

"A. Because it's an injury. And I'm—I took the photograph and got in touch with you.

"Q. To do what?

"A. Get in touch with you.

"Q. Did you call me that day?

"A. Yes, I did.

"Q. Okay. And did I ask you to take the photograph?

"A. Yes, you did."

Then, when examining Kennedy, defense counsel asked her, "And at some point did you, you or Mr. Williams, provide me with the pictures?" Kennedy answered, "Right after the incident occurred."

In the absence of defense counsel's questions, we might agree that the prosecutor's comments on Kennedy's right to counsel were fundamentally unfair. But where, as here, a defendant uses her invocation of counsel to suggest her innocence or to bolster her credibility, it would be unfair to preclude the prosecutor from making the opposite argument. (See, e.g., *State v. Santiago* (2007) 100 Conn.App. 236 [917 A.2d 1051].) In *Santiago*, for example, defense counsel invited the jury to find that his client did the right thing when, after shooting the victim, he went to the police. The prosecutor responded by detailing exactly what the defendant did after shooting the victim, namely, he " 'ditched' " the gun, went home, showered, called his attorney, and went to the police, accompanied by his attorney. *Santiago* held that the prosecutor did not commit misconduct because it would be "fundamentally unfair to the state were we to permit the defendant's attorney to comment on the evidence of his conduct after the shooting and to suggest reasonable inferences to be drawn from that conduct, while precluding the state from doing the same in response." (*Id.* at p. 247 [917 A.2d at p. 1059].)

20

Here, a reasonable interpretation of defense counsel's line of questioning is he was trying to show that Kennedy took photographs of her injuries because *he* was constructing a defense, not she. In other words, she didn't take the photographs because she was guilty, she took them at her counsel's instruction. Under the very specific circumstances here, Kennedy cannot argue that her invocation of counsel suggests her innocence and, at the same time, preclude the prosecutor from suggesting the opposite. We therefore conclude that Kennedy's constitutional rights were not violated by the prosecutor's comments about Kennedy's hiring of defense counsel.

Because defense counsel's purported failure to object to the prosecutor's comments is a subject in the habeas petition, we also address whether defense counsel forfeited any issue on appeal, thereby rendering ineffective assistance. To preserve a claim a prosecutor improperly commented on the defendant's exercise of a constitutional right, the defendant must object to the prosecutor's comments on this basis. (See *People v. Valdez* (2004) 32 Cal.4th 73, 127; *People v. Medina* (1995) 11 Cal.4th 694, 756.) Defense counsel objected the first time the prosecutor mentioned during closing argument that defendant hired counsel. The "objection," however, was unspecified and the trial court overruled it.

Although a defendant generally may not argue on appeal that evidence should have been excluded for a reason not asserted at trial, a defendant may argue that the "asserted error in overruling the trial objection had the legal consequence of violating due process." (*People v. Partida* (2005) 37 Cal.4th 428, 431.) To the extent the prosecutor's comments had the potential legal consequence of violating defendant's due process rights, we may consider that constitutional claim as not forfeited. Therefore, based on defense counsel's initial objection, we conclude he did not fail to object. We also reject defendant's related contention, raised in the habeas petition, that her trial counsel was ineffective for failing to renew the objection. Based on the trial court's denial of the initial objection, defense counsel could have reasonably believed that further objections would be futile, only highlighting further the prosecutor's argument or be counterproductive. (*People v. Hill* (1998) 17 Cal.4th 800, 820-821.)

21

In any event, we have concluded that the prosecutor's comments were not misconduct and did not violate defendant's due process rights. Therefore, they were not objectionable and defense counsel cannot be faulted for either failing to object on the proper ground or to raise additional objections. (*Strickland v. Washington, supra,* 466 U.S. at p. 694; *People v. Holt, supra,* 15 Cal.4th at p. 703.)

**V.     Sentencing error.**

Although the information alleged a great bodily injury enhancement under section 12022.7, subdivision (a), and personal use of a deadly weapon under section 12022, subdivision (b)(1), the jury was neither instructed on those enhancements nor rendered a verdict on them. The trial court, however, imposed but stayed under section 654 a one-year term for the great bodily injury enhancement. The People concede that the one-year term must be stricken and the abstract of judgment corrected.

**VI.    The petition for writ of habeas corpus.**

In her petition for writ of habeas corpus, Kennedy claims that her imprisonment is unlawful because she was deprived of her rights under the Sixth and Fourteenth Amendments when her trial counsel failed to call two witness, Shanisha Robinson and Owens, failed to object to prosecutorial misconduct concerning her right to counsel and concerning her prior conviction, and failed to object to the trial court's comments during voir dire.

We have already rejected in the direct appeal Kennedy's claims that the prosecutor committed misconduct by referring to her right to counsel and by failing to object to the trial court's comments. We now consider, and reject, her remaining claims raised in the petition.

A. *Law on ineffective assistance of counsel claims.*

"A meritorious claim of constitutionally ineffective assistance must establish both: '(1) that counsel's representation fell below an objective standard of reasonableness; *and* (2) that there is a reasonable probability that, but for counsel's unprofessional errors, a determination more favorable to defendant would have resulted. [Citations.] If the defendant makes an insufficient showing on either one of these components, the

22

ineffective assistance claim fails.' " (*People v. Holt*, *supra*, 15 Cal.4th at p. 703; see also *People v. Lopez* (2008) 42 Cal.4th 960, 966; *Strickland v. Washington, supra*, 466 U.S. at p. 687.)  A reasonable probability is a probability sufficient to undermine confidence in the outcome.  (*People v. Bolin* (1998) 18 Cal.4th 297, 333.)

" ' "Reviewing courts defer to counsel's reasonable tactical decisions in examining a claim of ineffective assistance of counsel [citation], and there is a 'strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance.' " [Citations.]' " (*People v. Jones* (2003) 29 Cal.4th 1229, 1254; see also *People v. Lopez, supra*, 42 Cal.4th at p. 966.)  If the record on appeal sheds no light on why counsel acted or failed to act in the manner challenged, an appellate claim of ineffective assistance of counsel must be rejected unless counsel was asked for an explanation and failed to provide one, or there simply could be no satisfactory explanation.  (*People v. Mendoza Tello* (1997) 15 Cal.4th 264, 266; *Jones*, at p. 1254.) "Were it otherwise, appellate courts would be required to engage in the ' "perilous process" ' of second-guessing counsel's trial strategy." (*People v. Frye* (1998) 18 Cal.4th 894, 979, disapproved on another ground in *People v. Doolin, supra,* 45 Cal.4th at p. 421, fn. 22.)

B.     *The failure to call Shanisha Robinson.*

In her declaration dated September 2, 2012, Robinson states that she saw Kennedy on March 8, 2010, two days after the altercation with Layton.  Kennedy had cuts on her face, shoulder and back, and the cuts to her face and shoulder looked like they might require stitches.  Kennedy told Robinson that she got into a fight with a girl.

Kennedy contends that Robinson's testimony was particularly significant because it went to Kennedy's intent, specifically, it tended to show that she lacked the specific intent required of aggravated mayhem.  Robinson's testimony buttressed the defense theory either that Kennedy acted in self-defense or that this was a "spontaneous melee in which both sides were cut rather than an intentional act of disfigurement," which might have led the jury to convict Kennedy of the lesser offense of simple mayhem.

Although Kennedy's trial counsel declined her request to explain why he did not call Robinson, there are several tactical reasons why he might have decided not to call her as a witness at trial.[9]  First, Williams gave essentially the same testimony, and trial counsel might have believed that the evidence was merely cumulative.  Second, Robinson could say only that she saw the injuries two days after Kennedy's fight with Layton.  Robinson had no personal knowledge precisely when or how they were inflicted. We therefore do not agree with Kennedy's assertion that Robinson's testimony would have spoken to her lack of specific intent to commit mayhem.  Third, the major injury in dispute was the injury depicted in Defense Exhibit D.  Kennedy's own doctor could not identify that injury, and nothing in Robinson's declaration identifies the injury or connects it to the altercation with Layton.

C.    *The failure to call Aaron Owens.*

Owens, defendant's brother, signed a declaration dated August 13, 2012 stating that after hearing a knock on his door the morning of March 7, 2010, he never opened the door for his sister and she never came into the house.  If she had come into the house to get a glass, he "would have been able to see her do that."  He did not witness a fight between Kennedy and Layton and he did not intervene in one.

As with Robinson's testimony, we can easily discern several reasons why trial counsel could have decided not to call Owens as a witness.  First, Owens was Kennedy's brother.  As her brother, counsel could have thought his credibility would be too suspect. Counsel could have believed that a jury would reject as incredible his assertion he didn't let his sister into his house (after all, why force Layton out of the house if he never let his sister in) and that he did nothing to intervene in an attack which, it is reasonable to infer, he was aware of.  Second, Owens's testimony did not negate Layton's testimony Kennedy went into the house to get a glass.  That Owens "would have been able to see" Kennedy get a glass does not show that Kennedy never went into the house to get the weapon.  The only way he could say that Kennedy never got a glass is if he had a view of

_____

**9**     As part of the petition, Kennedy attaches a letter sent to her trial counsel asking him to explain why he didn't call Robinson and Owens at trial.

the entire house at once or if he was with her in the house, a fact he denied. Even if the jury believed that Kennedy got into the backyard by coming around the house rather than through it, the jury still could have believed that Kennedy went into the house through the back door to get the glass.

D.     *Mischaracterization of the 2003 prior battery.*

Finally, Kennedy contends that her trial counsel was ineffective because he failed to object to the prosecutor's characterization of the prior 2003 battery. The evidence, introduced via the officer who responded to the scene, was that Kennedy said, " 'I got mad because my man was talking with that bitch. So we started fighting and I bit him.' " Based on this, Kennedy argues that the evidence was she fought with her boyfriend and not with the woman he was talking to.

But when the prosecutor questioned Kennedy about the incident, he characterized the incident as a fight with the woman. He asked Kennedy whether when she "started attacking that female and when your boyfriend intervened you bit him," and she answered, "No." During closing argument, the prosecutor argued that Kennedy "went after the boyfriend when he tried to intervene after she started attacking the female" and the only reason Kennedy didn't attack Williams during the current altercation with Layton was he didn't intervene on her behalf.

There was a tactical reason why Kennedy's trial counsel may not have objected: this was a fair characterization of the evidence. Certainly, one interpretation of Kennedy's statement that " 'we started fighting and I bit him' " is she fought with her boyfriend and bit him. But because it was never clarified who the "we" referred to, Kennedy could also have been referring to the woman her boyfriend was talking to. And although Kennedy denied that she bit her boyfriend after he intervened in her attack on the woman, it is unclear whether she was denying the incident occurred or what exactly she was denying. We therefore conclude that Kennedy's trial counsel did not give ineffective assistance by failing to object to these statements.

25

**VII.    Cumulative error.**

Defendant contends that the cumulative effect of the purported errors undermined the trial's fundamental fairness and requires reversal.  As we have " 'either rejected on the merits defendant's claims of error or have found any assumed errors to be nonprejudicial,' " we reach the same conclusion with respect to the cumulative effect of any purported errors.  (*People v. Cole* (2004) 33 Cal.4th 1158, 1235-1236; *People v. Butler* (2009) 46 Cal.4th 847, 885.)

## DISPOSITION

The one-year enhancement imposed under section 12022.7, subdivision (a), is stricken.  The Clerk of the Superior Court is directed to forward a modified abstract of judgment reflecting this modification to the Department of Corrections.  The judgment is otherwise affirmed as modified.  The petition for writ of habeas corpus is denied.

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**

ALDRICH, J.

We concur:

KLEIN, P. J.

KITCHING, J.